# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| RHONDA CRAYTON and<br>SHEILA REED, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No. 15-cv-2270-STA-cgc** |
| | ) | |
| | ) | |
| PHARMEDIUM SERVICES, LLC and<br>KERI KJELLIN, and JOHN TOTH, | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF SHEILA REED

Plaintiffs Rhonda Crayton and Sheila Reed filed this action against their former employer PharMEDium Services, LLC ("PharMEDium"), and PharMEDium employees, Keri Kjellin and John Toth,[1] pursuant to 28 U.S.C. § 1981.[2]  (ECF No. 1.)  Defendants have filed a motion for summary judgment as to Plaintiff Reed (ECF No. 57), Plaintiff has filed a response to the motion (ECF No. 67), Defendant has filed a reply to the response (ECF No. 78), and Plaintiff has filed a

---

[1]  Unlike Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, individuals may be sued for violations of § 1981.  *See Jones v. Cont'l Corp.,* 789 F.2d 1225, 1231 (6th Cir. 1986) ("[T]he law is clear that individuals may be held liable for violations of § 1981.").

[2]  The complaint states that Plaintiffs will file an amended complaint to add claims pursuant to Title VII after receiving a notice of right to sue from the Equal Employment Opportunity Commission ("EEOC").  (ECF No. 1, ¶ 6.) No such amendment has been filed. Therefore, the only claims before the Court are Plaintiffs' § 1981 claims.

sur-reply.[3]   (ECF No. 81-2.)   For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

<u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the non-movant. [5]   In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence."[6]   When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." [7]   These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[8]   When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to

---

[3]  A motion for summary judgment as to Plaintiff Rhonda Crayton is pending.  (ECF No. 60.)

[4]  Fed. R. Civ. P. 56(c).

[5]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[6]  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

[7]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

[8]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[9] The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."[10]

Statement of Facts

The parties have agreed that the following facts are undisputed unless otherwise noted:

PharMEDium Services, LLC, is a limited liability company organized under the laws of the State of Delaware. It provides compounding services to hospital pharmacies, including the formulation of pain-management medication used in the administration of epidural anesthesia. One of PharMEDium's facilities is located at 6100 Global Drive in Memphis, Tennessee. The Memphis facility compounds admixtures that are narcotic.[11]

During the relevant time period, Defendant John Toth, Caucasian, was the Director of Quality Operations at the Memphis facility. As the Director of Quality Operations, Toth was responsible for the quality groups in each facility, including the laboratory. Toth reported directly to Tom Rasnic, the Vice President of Quality Regulatory and Research and Development.[12]

During the relevant time period, Defendant Keri Kjellin, Caucasian, was the EPA Lab Manager at the Memphis facility. As the EPA Lab Manager, Kjellin was responsible for assigning work in the lab and selecting employees for particular projects in the lab. She also was

---

[9] *Id.* at 251–52.

[10] *Celotex*, 477 U.S. at 322.

[11] (Pl's Resp. to Defs' SOF, ¶¶ 1 – 4, ECF No. 66-1.)

[12] (*Id.* at ¶¶ 5 – 7.)

responsible for ensuring that the lab's methods and procedures were followed and that the instrumentation was operating appropriately. Kjellin reported directly to Toth.[13] Kjellin supervised ten employees, which included five chemists – Plaintiffs Sheila Reed and Rhonda Crayton, African-American; Dustin Hall, Caucasian; Tanika Aurora, East Indian; and Elizabeth Simpson, Caucasian.[14]

The Memphis lab is charged with testing the identity and potency of final drug products. Once the drug products are compounded on site, a sample of the product goes to the lab for testing. The testing equipment in the lab consists of HPLC (high pressure liquid chromatography) and UPLC (ultra performance liquid chromatography). Balances, water purification systems, and different types of glassware to measure solutions are part of the equipment used in the lab. The testing is done to monitor the operation and to ensure that the processes are staying within a state of control. The Memphis lab is a highly regulated environment by both state and federal regulations.[15]

PharMEDium is committed to developing quality processes that facilitate the highest level of safety for patients who are recipients of critical intravenous and epidural preparation. Accordingly, because public safety is dependent upon PharMEDium's services, adherence to its Standard Operating Procedures is important.[16]

---

[13] (*Id.* at ¶¶ 8 – 10.)

[14] (*Id.* at ¶ 11.) The five non-chemist employees supervised by Kjellin were African-American technicians.

[15] (*Id.* at ¶¶ 12 – 15.)

[16] (*Id.* at ¶ 16.) Plaintiff contends that exceptions are made to the policies and procedures.

PharMEDium's handbook states that it is committed to providing a work environment free from discrimination and harassment.[17] Additionally, PharMEDium's handbook outlines prohibited conduct. Specifically, the handbook categorizes the following offenses as major offenses: "[t]hreatening, intimidating, coercing, or interfering with any other employee"; "[t]heft or misappropriation of property of other employees, vendors of the Company"; and "[a]buse, misuse, or deliberate destruction of company property, tools, equipment or the property of any employees or vendors in any manner."[18]

Plaintiff Reed graduated from Alcorn State University in 1993 with a B.S. in biology. From 1993 until 2006, Plaintiff worked at Solutia as a chemist where she had supervisory experience as a shift lead. She worked as a certified scientist from 2006 to 2011. She then worked at KIK Custom Products, Inc., as a quality control chemist for approximately one year and supervised two quality technicians.[19]

Plaintiff began employment with PharMEDium as a temporary employee in September 2012. She underwent training for at least a month and continued to receive training throughout her employment.[20]

On December 24, 2012, Kjellin hired Plaintiff to work full-time as an End Product Assurance QC Chemist in the Memphis lab.[21] Plaintiff was specifically hired to work on routine

---

[17] (*Id.* at ¶ 17.)

[18] (*Id.* at ¶ 18.) Plaintiff disputes whether the procedures in the handbook were actually followed.

[19] (Defs' Resp. to Pl's SOF, ¶ 71, ECF No. 78.) Defendants have responded only to those additional facts submitted by Plaintiff that they dispute. (*Id.* at p. 1 n. 1.) Therefore, the Court's citation to Defendants' response to an additional fact submitted by Plaintiff indicates an implicit admission by Defendants that the fact is not disputed.

[20] (*Id.* at ¶ 72.)

testing, monitoring, and continuing transfers of samples from a third-party lab. Plaintiff's employment was at will, and she was subject to a confidentiality agreement covering PharMEDium's proprietary information and trade secrets. According to Plaintiff's job description, her job responsibilities included: "[r]eceiving, storing and logging in samples testing analysis; . . . [s]etting up and performing sample analysis per cGMP/GLP Guidelines . . . [and] Follow Standard Operating Procedures." Kjellin was Plaintiff's direct supervisor.[22] Plaintiff was hired as a full time chemist at the same time as Dustin Hall.[23]

On or around May 10, 2013, Plaintiff received her 2012-2013 annual performance review. The rating scale was 1-5 with 5 being the highest. Plaintiff received an overall "meets" expectations or a 3. Kjellin made no negative comments, and Kjellin had no concerns about Plaintiff's performance. Plaintiff received a 4 or "exceeds" expectations in the area of teamwork and communication.[24]

In July 2013, Plaintiff applied for a Quality Supervisor position. Rusty Mason, Caucasian, Quality Manager, was responsible for hiring for this position. Mason selected which candidates she would interview. When looking for a new Quality Supervisor, Mason was looking for her own ultimate replacement, so she needed an individual with managerial experience to step into her role with little learning curve. Approximately thirty employees

---

[21] (Pl's Resp. to Defs' SOF, ¶ 19, ECF No. 66-1.)

[22] (*Id.* at ¶¶ 20 – 23.)

[23] (Defs' Resp. to Pl's SOF, ¶ 73, ECF No. 78.)

[24] (*Id.* at ¶¶ 74 –75.)

(quality associates, documentation clerks, and quality technicians) reported to the Quality Supervisor. Mason interviewed Plaintiff on August 8, 2013.[25]

It was Mason's opinion, based on her interview with Plaintiff and Plaintiff's work experience, that Plaintiff did not possess the supervisory experience necessary for the position. Therefore, Plaintiff was not selected for the position.[26]

Mason made an offer to an African national, Kingsley Onwuemenyi, who declined the position. After conducting an additional search, Mason offered the position to Gary Skoff, a Caucasian, who had management experience.[27]

On or about May 5, 2014, Kjellin provided Plaintiff with her 2013-2014 Annual Performance Review. This review covered the time period from April 2, 2013, through March 31, 2014. Once again, Kjellin rated Plaintiff as overall "meets" expectations with no concerns about her performance, and she wrote no negative comments. Instead, Kjellin rated Plaintiff as "exceeds" expectations in sample testing and in teamwork and communication. The factors to be considered for the teamwork/communication rating are: "Builds respectful and productive relationships both internally and externally to maximize company success; provides on-going participation and support for team projects and efforts; values differences in others and works cooperatively; provides timely responses to customer questions, problems, and requests to ensure customer satisfaction; works harmoniously and effectively with others, and assists when needed." In a section for employee comments at the end of the evaluation, Plaintiff noted, "With

---

[25] (Pl's Resp. to Defs' SOF, ¶¶ 24-27, ECF No. 66-1.)

[26] (*Id.* at ¶ 28.)

[27] (*Id.* at ¶¶ 30 - 31.)

our lab growing in the near future I hope to be [a] mentor into a lead role within the EPA laboratory."[28]

During this evaluation, Kjellin told Plaintiff that she would arrange for her to have leadership training by the end of 2014 as Kjellin was aware that Plaintiff wanted to advance and grow in her career. On July 1, 2014, Plaintiff sent Kjellin an email following up on her request for leadership training. Kjellin did not arrange for leadership training for Plaintiff but did send Dustin Hall, the chemist who was hired the same day as Plaintiff, to training.[29]

On September 25, 2014, Kjellin held a lab meeting and announced that she was appointing Dustin Hall (Caucasian) and Elizabeth Simpson (Caucasian) as the "point persons" for the laboratory. After the meeting, Plaintiff attempted to discuss with Kjellin the placement of Simpson and Hall in these positions. Kjellin suggested that Plaintiff take her concerns to Toth.[30]

On October 7, 2014, Plaintiff filed a complaint of racial discrimination with Erika Robey, an African-American and the local HR representative. Plaintiff complained of a series of issues that she believed constituted racial discrimination and harassment. Specifically, she complained that Kjellin had given preference to Hall and Simpson in opportunities and special projects that set them up for advancement over Plaintiffs Reed and Crayton and Ada Fifer (all minority employees). Additionally, she listed a series of individual racially offensive and discriminatory statements allegedly made by Simpson and Kjellin that had occurred during her employment

---

[28] (Defs' Resp. to Pl's SOF, ¶ 77, ECF No. 78.)

[29] (*Id.* at ¶ 78.)

[30] (*Id.* at ¶¶ 79-80.) The parties dispute whether these positions provided supervisory and leadership experience or, instead, were merely "glorified message-takers individuals who relayed to Kjellin messages from employees outside the lab whenever Kjellin was not present in the lab." (*Id.* at ¶ 79); (Pl's Resp. to Defs' SOF, ¶ 32, ECF No. 66-1.)

with PharMEDium. Plaintiff stated that she did not feel that she could go to Toth with these issues because Kjellin had repeatedly stated that Toth would back her up regardless of the situation.[31]

Robey forwarded Plaintiff's complaint to Nancy Brandt, Caucasian, Director of Human Resources, who was located at PharMEDium's headquarters in Lake Forest, Illinois.[32] Brandt forwarded the complaint to Tom Rasnic, Toth's boss and Vice President of Quality and Regulatory and Research and Development, Tom Cosentino, Vice President of Field Operations, and Roderick Bergin, Senior Legal Counsel. Rasnic then forwarded the complaint to Toth on October 9, 2014, prior to Brandt speaking to Toth. Brandt assumed control over the investigation of the complaint.[33]

On October 10, 2014, Plaintiff Crayton filed a complaint of racial discrimination and harassment that also included a claim that Kjellin was manipulating the results of the integration of the chromatography in order to bring drugs being tested within specifications. This complaint was filed with Robey and forwarded to Brandt.[34] PharMEDium began an investigation.

On October 14, 2014, Brandt conducted a telephone interview with Kjellin in which she informed her that complaints of discrimination had been filed against her. This conversation was when Kjellin learned of the complaints, and it was clear to her the identity of the complainants. In the interview with Brandt, Kjellin stated that Plaintiffs felt that they were "entitled." Kjellin

---

[31] (Defs' Resp. to Pl's SOF, ¶ 81, ECF No. 78.) Defendants admit that these accusations were made by Plaintiff Reed but not that the accusations were true.

[32] (Pl's Resp. to Defs' SOF, ¶ 33, ECF No. 66-1.)

[33] (Defs' Resp. to Pl's SOF, ¶¶ 82 - 83, ECF No. 78.)

[34] (*Id.* at ¶ 84.)

denied that any comments that were race-related took place in the laboratory. Kjellin said that she had chosen Hall for the point person position because he had demonstrated leadership qualities and had chosen Simpson to give her an opportunity to develop new skills. Kjellin stated that Plaintiff was an excellent chemist but did not have a skill set beyond that. Kjellin also stated in response to questions about comments being made about race and minorities, "[D]id anybody stop to think that maybe I'm the minority." Kjellin was frustrated by the accusations. Brandt could not recall warning her not to retaliate against Plaintiffs.[35]

On October 17, 2014, Kjellin sent an email to Toth entitled "List of Issues." In this email, Kjellin listed a series of issues that she claimed were occurring with Robey and Plaintiff. Kjellin stated that a staff member did not feel comfortable around Plaintiff because of her relationship with Robey and that a trust issue had been created. Kjellin stated that a staff member had noted "that after a few days of Sheila being on vacation that there was a peace and calm in the lab from the no interruptions from HR and tension between staff members was minimal." Kjellin also wrote in the email that Mason had told her that Robey had pushed Mason to interview Plaintiff for the Quality Supervisor position. According to Kjellin, after the interview, Plaintiff Reed "was visibly annoyed with me because I could not give her any information on the position or why she was not a chosen candidate," was short with Kjellin, and conveyed in her "general disposition" a problem with her attitude.[36]

Despite the statements in this email, Kjellin rated Plaintiff as "Exceeds" expectations for teamwork/communication in her 2013-2014 Annual Performance Review. If there had been an issue with Plaintiff's attitude in the time frame Kjellin says it occurred, this would have been the

---

[35] (*Id.* at ¶ 85.)

[36] (*Id.* at ¶ 86.)

review and rating category where that critique would have been noted. Kjellin did not include any such critique. Mason testified that she was never pushed by anyone, including Robey, to interview Plaintiff and that she has no recollection of telling Kjellin that she had been pushed to interview Plaintiff.[37]

On October 21, 2014, Brandt interviewed Plaintiffs in person regarding their claims of racial discrimination and harassment. In their interviews, Plaintiffs detailed their complaints of racial discrimination, including their allegations of unfair assignment of projects and leadership development opportunities, racially offensive and inappropriate statements made in the laboratory by Simpson and Kjellin, and the discriminatory application of company policies between white and minority employees. Brandt believed that Plaintiffs were sincere in their complaints of racial discrimination and harassment.[38]

On October 22, 2014, Brandt met with Toth and Robey. During her meeting with Toth, Brandt instructed him to meet with Simpson and with Plaintiffs. Brandt later emailed Toth and copied Rasnic. Brandt wrote this email because Toth had not followed up with the meetings that she had asked him to have.[39]

On October 23, 2014, Plaintiffs met with Toth regarding their complaints. During this meeting, Toth informed Plaintiffs that he was aware of their complaints, which were still under investigation. He informed them that PharMEDium would be rotating the point person position. Toth also met with Simpson at Brandt's direction regarding the comments that Simpson had allegedly made. Following Toth's conversation with Simpson, Brandt instructed Toth to follow

---

[37] (*Id.* at ¶ 87.)

[38] (*Id.* at ¶ 88.)

[39] (*Id.* at ¶¶ 89 - 90.)

up with both Kjellin and Simpson to reinforce PharMEDium's position that there was no tolerance for racially offensive comments.[40]

On October 27, 2014, Rasnic emailed Toth and stated, "I feel as if we are chasing a ghost!" Toth responded in part, "Yes, it seems so. I do not think we should have the expectation that this will be wrapped up with a pretty little bow or that we are going to find somebody to hang this all on."[41]

On October 28, 2014, Plaintiff Crayton emailed Brandt to complain of what she contended was retaliatory behavior at the hands of Kjellin. On October 29, 2014, Plaintiff Reed called Brandt to complain of retaliation.[42]

On November 3, 2014, Brandt conducted telephone interviews with Simpson and Tanika Aurora. In the conversation with Aurora, Aurora confirmed that Simpson had made a comment about individuals having trouble with another employee because English was his second language and that Simpson had asked Plaintiff Reed if Martha Haynes, the first African-American woman to receive a Ph.D. in mathematics, looked black. Simpson received training for making these comments.[43]

On November 4, 2014, Brandt conducted a follow-up conversation with Kjellin in which Kjellin acknowledged that a discussion related to race occurred in her presence. Kjellin did not deny that other statements had been made but just stated that she could not recall if that had

---

[40] (Pl's Resp. to Defs' SOF, ¶ 37, ECF No. 66-1.)

[41] (Defs' Resp. to Pl's SOF, ¶ 91, ECF No. 78.)

[42] (*Id.* at ¶¶ 92-93.)

[43] (*Id.* at ¶ 94.)

happened. Kjellin and Brandt discussed communications training for Simpson. Kjellin also received training.[44]

On November 5, 2014, Antonique Farsee discovered a personal notebook belonging to Simpson which allegedly contained threats to harm Plaintiff Reed.[45]  Farsee told Plaintiffs about the threats and took photographs of the notebook pages with her cell phone.  Farsee tried to send copies of the photographs to Plaintiffs, but she misspelled Reed's email address, and Reed did not receive them at that time.  Plaintiff Reed attempted to report the issue to Human Resources, but no one was in the office when she went there.  She then reported the existence of the notebook pages to Will Hardiman, the plant manager. She asked Hardiman to go or have someone from Human Resources go and physically pick up Simpson's notebook immediately.[46]

Hardiman asked who had seen the actual notebook.  Reed told him that Farsee had.[47] Hardiman then asked to speak to Farsee.  There is no evidence that Simpson made any face-to-face threats to Plaintiffs or anyone else in the lab.[48]

On November 7, 2014, two days after Reed reported the notebook pages, Kjellin picked up all of the notebooks in the laboratory as instructed by Toth.  Toth never spoke to Reed about the notebook, and Reed did not know that Hardiman had not recovered the notebook.[49]

---

[44]  (*Id.* at ¶ 95); (Pl's Resp. to Defs' SOF, ¶¶ 44 – 45, ECF No. 66-1.)

[45]  Defendants deny that any threats were made by Simpson against Plaintiff Reed in the notebook.

[46]  According to Plaintiff, she did not feel that it was her place to bring Hardiman the notebook because it did not belong to her.  (Pl's Resp. to Defs' SOF, ¶ 40, ECF No. 66-1.)

[47]  (Defs' Resp. to Pl's SOF, ¶ 96, ECF No. 78.)   Plaintiff contends that Hardiman did not ask her who had copies and/or photographs of the notebook pages but, instead, asked who had actually seen the notebook pages. (Pl's Resp. to Defs' SOF, ¶ 39, ECF No. 66-1.)

[48]  (Pl's Resp. to Defs' SOF, ¶ 59, ECF No. 66-1.)

Kjellin reviewed all of the confiscated notebooks within a week or two of November 7, 2014. Kjellin found documents in Reed's training notebook that PharMEDium would later claim were not authorized to be in her possession, and Kjellin turned them over to Toth within those two weeks in November.[50]

On November 10, 2014, Reed filed a charge of racial discrimination and retaliation against PharMEDium with the EEOC.[51]

On or around November 12, 2014, Reed became aware that a laboratory notebook that she contends that she needed to complete her work was taken up by Kjellin. Reed asked Kjellin for the notebook, and Kjellin told her that she could not have it. Reed had witnessed Simpson obtaining notebooks that Simpson needed to complete her work. As a result of the confiscation of the notebook and some personal items, including Reed's eyeglasses, Reed sent an email to Brandt on November 13, 2014, complaining of alleged retaliation by Kjellin.[52]

After looking for the eyeglasses to no avail, Brandt offered to reimburse Reed for the missing eyeglasses. However, Reed never followed up with Brandt. The November 13 query from Reed prompted Toth to re-examine some of the personal items that had been collected in early November.[53]

---

[49] (Defs' Resp. to Pl's SOF, ¶ 96, ECF No. 78.) It is unclear from the record whether Simpson's notebook was ever located. (Pl's Resp. to Defs' SOF, ¶ 42, ECF No. 66-1.)

[50] (Defs' Resp. to Pl's SOF, ¶ 97, ECF No. 78.)

[51] (*Id.* at ¶ 98.)

[52] (*Id.* at ¶¶ 99-100.) Defendants deny that Plaintiff Reed needed the notebook to do her work.

[53] (Pl's Resp. to Defs' SOF, ¶¶ 48 – 49, ECF No. 66-1.)

On November 17, 2014, Kjellin emailed Reed stating that she needed the "latest update to the filter study spreadsheet sent to me today." Reed was allegedly unable to complete this work because Kjellin had withheld the notebooks needed to perform the work on November 12, 2014. Kjellin later offered to provide the notebooks to Reed so that she could complete her work.[54]

On November 18, 2014, Reed sent an email to Brandt complaining about the November 17 email from Kjellin and stating, "Keri has only taken these actions after my complaint was filed. Again it does not seem that she is being held accountable for her actions. Her actions are causing undue stress and hardship to me and my family."[55]

On December 1, 2014, Kjellin complained to Toth about Plaintiff's review of a chromatography procedure.[56]

On December 4, 2014, Kjellin sent an email to Toth questioning why Reed was in the laboratory after 7 p.m. Kjellin wrote, "There is nothing that I have given her to do for her to be in the building at this time. I would be very interested to look at the footage of what she has been working on this evening."[57]

On December 12, 2014, Brandt spoke with Reed on the telephone regarding the outcome of the investigation of Plaintiffs' complaints. During this conversation, Brandt informed Reed that she was closing the investigation. Brandt further told Reed there was to be rotation of the point person position, a new policy/procedure was to be developed on chromatography, and

---

[54] (Defs' Resp. to Pl's SOF, ¶ 101, ECF No. 78.)

[55] (*Id.* at ¶ 102.)

[56] (*Id.* at ¶ 103.) It is not clear from the record whether Plaintiffs had been asked to review this procedure and provide input.

[57] (*Id.* at ¶ 104.) The parties dispute whether Plaintiff Reed needed to be working in the lab at this time.

diversity training was to be implemented. Brandt informed Reed that she had interviewed seven people and had documented the files accordingly.[58] Additionally, the following actions were taken in response to the complaints: (1) Simpson was counseled and reminded not to make additional comments because such comments were not tolerated by PharMEDium; (2) the "point persons" idea as envisioned by Kjellin was not implemented; and (3) diversity training occurred.[59]

On December 24, 2014, Reed emailed Brandt again regarding Kjellin's alleged harassment. This harassment included: (1) Kjellin's alleged comment that the Attorney General should not be protecting black people but, instead, police officers who serve and protect lives; (2) a comment Reed heard regarding repositioning cameras in the lab; and (3) a reiteration of her previous complaints – complaints that had already been investigated. Reed requested a transfer out of the lab, referring to the alleged threats contained in Simpson's notebook. Brandt responded that she would follow up on these issues.[60]

On December 31, 2014, Kjellin spoke to Gus Gipson, an African-American Human Resources Consultant. Kjellin claimed that Ada Fifer had come to her because Reed "approached her in the work areas asked why she had not reached out to Rhonda Crayton, since she had not been at work. Keri added that Ada was very upset; felt harassed, bullied and wanted to report this matter." Gipson and Rosalind Gilmore, an African-American Human Resources Representative, spoke to Fifer outside of the presence of Kjellin. Fifer stated that she wanted to

---

[58] (Pl's Resp. to Defs' SOF, ¶ 55, ECF No. 66-1.)

[59] (*Id.* at ¶ 56.) The diversity training may have occurred after the termination of Plaintiffs.

[60] (*Id.* at ¶ 57.)

speak to Reed directly about it. Fifer said that Reed had not been rude or intimidating. According to Gipson, Fifer never said that she felt bullied or harassed.[61]

On January 6, 2015, Gipson spoke to Reed who admitted that she had a conversation with Fifer, but Plaintiff never admitted confronting, interfering, or attempting to intimidate Fifer. Instead, Reed stated that she asked Fifer if she had reached out to Crayton, who had been suspended, as they were all friends. Reed then suggested that she should encourage Crayton in light of what had occurred.[62]

In the spring of 2013, Simpson had confronted Plaintiff Crayton regarding the hours that she worked even though Simpson was Crayton's coworker and not her supervisor. Simpson received no discipline for that incident and remained employed until January 13, 2015.[63]

In an email from Reed in early January 2015, Brandt learned that Reed had copies of Simpson's alleged threatening notebook pages – a fact unknown to Defendants in November when the pages had been discovered. Reed never told management that she had photographic copies of the notebook pages until she emailed Brandt in January. According to Reed, she was never asked if she had copies of the notebook pages but, instead, was only asked who had seen the notebook. When Brandt requested copies of the notebook pages which had been sent to Reed on her phone, Reed provided only two of the five pages. Reed contends that only two of the pages were legible and she did not have time to make the other pages legible due to the poor quality of the photographs. According to Defendants, if Reed had come forward with the

---

[61] (Defs' Resp. to Pl's SOF, ¶ 108, ECF No. 78.) Defendants appear to reason that Reed's statements must have offended Fifer because she reported those statements. (Pl's Resp. to Defs' SOF, ¶ 60, ECF No. 66-1.)

[62] (Defs' Resp. to Pl's SOF, ¶ 109, ECF No. 78.)

[63] (*Id.* at ¶ 110.)

notebook pages in November, they would not have had to "waste" time taking up the notebooks and reviewing them.[64]

When Toth reviewed Reed's notebooks that had been collected when management was searching for Simpson's notebook, he discovered documents that Defendants contend should not have been in Reed's possession, namely destruction logs which should have remained with the destroyed product per FDA guidelines. According to Plaintiff, the documents were merely training documents. Destruction logs are forms PharMEDium uses to track and show that the lab destroyed unused sample product. These documents are subject to FDA and DEA regulations. The purpose of the destruction log is to show and document any sample that is not consumed during lab testing. These destruction logs are translated into a DEA Form 41. The purpose of the Form 41 is to record any unused product. After completing the Form 41, the pharmacist would sign off and the form would be turned into Toth. If a chemist is in charge of destroying a sample, that chemist would know it actually had been destroyed because the pharmacist would sign off on everything. Therefore, the chemist could assume that the product had not been destroyed if the pharmacist had not signed off.[65]

The decision to terminate Reed was made on January 12, 2015, by Brandt, Hayes, and Rasnic. All of these individuals knew that Reed had made complaints of discrimination and retaliation. On January 13, 2015, Gipson, Gilmore, and Hardiman communicated the decision to Reed.[66] Simpson was also discharged that day.[67]

---

[64] (Pl's Resp. to Defs' SOF, ¶¶ 62 - 65, ECF No. 66-1.)

[65] (*Id.* at ¶¶ 50-52.)

[66] (Defs' Resp. to Pl's SOF, ¶¶ 105 - 106, ECF No. 78.) Plaintiff contends that Toth was also involved in the decision-making.

Reed was purportedly terminated for: (1) intimidation of a co-worker, Ada Fifer; (2) misrepresentation/omission of data during an investigation; and (3) possession of company documents without authorization.[68] PharMEDium has a progressive discipline policy in place that states that the "general practice is for progressive, corrective action, starting with a first warning and ending with termination." PharMEDium chose not to engage in progressive discipline with Reed and instead terminated her without any warnings or counseling. Management has some discretion to accelerate discipline to discharge.[69]

Three African-American associate chemists were hired after Plaintiffs were terminated. Plaintiffs' chemist positions were not filled.[70]

Other than the complaints from Plaintiffs, PharMEDium has not received any complaints regarding Kjellin or Toth.[71]

## Analysis

"Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors."[72] Section 1981 also prohibits an employer's retaliating against an employee for opposing racial discrimination.[73] To prevail, Plaintiff must prove by direct or circumstantial evidence that Defendants intentionally discriminated against

---

[67] (Pl's Resp. to Defs' SOF, ¶ 68, ECF No. 66-1.)

[68] (Defs' Resp. to Pl's SOF, ¶ 106, ECF No. 78.)

[69] (*Id.* at ¶ 107.)

[70] (Pl's Resp. to Defs' SOF, ¶ 69, ECF No. 66-1.)

[71] (*Id.* at ¶ 707.)

[72] *Spokojny v. Hampton*, 589 F. App'x 774, 777 (6th Cir. 2014) (citing *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 867–68 (6th Cir. 2001)).

[73] *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008).

her on the basis of race or in retaliation for her complaints of discrimination when they terminated her.[74]

Section 1981 claims are governed by the same burden-shifting standards as Title VII claims.[75] Absent direct evidence of intentional discrimination or retaliation, as in this case, a plaintiff must use the *McDonnell Douglas* framework for proving discrimination or retaliation through circumstantial evidence.[76] Under this framework, if Plaintiff establishes a prima facie case of race discrimination or retaliation, Defendants must then articulate a legitimate, nondiscriminatory reason for their employment decision.[77] If Defendants articulate a legitimate, nondiscriminatory reason for the decision to terminate Plaintiff, any presumption of discrimination or retaliation drops from the case, and Plaintiff must prove by a preponderance of the evidence that Defendants' stated reason was pretextual.[78] Although the burden of production

---

[74] *Spokojny,* 589 F. App'x at 777 (citing *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006)). In her response, Plaintiff has clarified that her claims are for racial discrimination and retaliation as they relate to her termination and states that she has abandoned any other claims, including her hostile environment claim. (Pl's Resp. p. 1, ECF No. 66.)

[75] *Wade v. Knoxville Utilities Bd.,* 259 F.3d 452, 464 (6th Cir. 2001). *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 . . . under the same standards as claims of race discrimination brought under Title VII.")

[76] *McDonnel-Douglas Corp. v. Greene*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1994). *See Lindsay v. Yates*, 498 F.3d 434, 440 n. 7 (6th Cir. 2007) ("The *McDonnell Douglas/Burdine* framework applies only when discrimination plaintiffs rely on circumstantial evidence to prove their claims.").

[77] *Hicks*, 509 U.S. at 506-07.

[78] *Id.* at 507.

shifts, the ultimate burden of persuading the trier of fact that Defendants intentionally discriminated or retaliated against Plaintiff remains at all times with Plaintiff.[79]

Race Discrimination Claim

To demonstrate a prima facie case of race discrimination, the plaintiff must show that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees."[80] "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination."[81]

Here, it is undisputed that Plaintiff Reed meets the first three elements of the prima facie case. She is African–American; she was terminated; and she was qualified for the position that she held. Defendants contend that Plaintiff cannot show that she was treated differently than similarly-situated, non-protected employees. In the alternative, Defendants contend that, even if Plaintiff has established a prima facie case, they have articulated a legitimate non-discriminatory reason for her termination that was not a pretext for discrimination. The Court finds Defendants'

---

[79] *Burdine*, 450 U.S. at 256.

[80] *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).

[81] *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 313 (6th Cir. 2012). *See also Baldwin v. Wright Patterson Air Force Base*, 463 F. App'x 487, 490 (6th Cir. 2012) (quoting *Macy*).

argument that Plaintiff cannot show that she was treated differently than similarly-situated, non-protected employees to be meritorious.

Although the Sixth Circuit Court of Appeals held in *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992), that to be considered "similarly situated" in the disciplinary context, "the plaintiff must show that the 'comparables' are similarly-situated *in all respects,*" the Court later clarified that "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar[, that is, "nearly identical,"] in "all of the *relevant* aspects."[82]

> Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.[83]

Courts "should not demand exact correlation, but should instead seek relevant similarity."[84] "In the disciplinary context, [the Sixth Circuit has] held that to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'"[85]

In the present case, Plaintiff contends that the following Caucasian employees were similarly situated to her but were treated differently: Defendant Keri Kjellin, Elizabeth Simpson,

---

[82] *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (citation omitted) (explaining that "*Mitchell* itself only relied on those factors relevant to the factual context in which the *Mitchell* case arose) .

[83] *Mitchell*, 964 F.2d at 583. *See also Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 471- 72 (6th Cir. 2002) (discussing that a similarly situated employee is one who has the same supervisor, was subject to the same standards of conduct, and engaged in "nearly identical" conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's response).

[84] *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

[85] *Wright*, 455 F.3d at 710 (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)).

and Dustin Hall. According to Plaintiff, both Kjellin and Simpson "confronted and intimidated" her and Plaintiff Crayton "but did not receive any discipline for those actions."[86]

To the contrary, it is undisputed that both Kjellin and Simpson were disciplined for their actions that were found to be inappropriate. They both were referred for training for their racial remarks, Kjellin was counseled, and Simpson was terminated on the same day that Plaintiff Reed was terminated. Moreover, Kjellin did not have the same supervisor or the same job as Plaintiff Reed.[87]

Plaintiff Reed points to Simpson's remarks to Plaintiff Crayton in 2013 concerning Crayton's alleged tardiness as being comparable to her own purported intimidating remarks to Fifer. Plaintiff's argument fails because there is no evidence that anyone in Human Resources or in management, other than Kjellin, knew about Simpson's remarks.[88] Especially of note is the fact that there is no evidence that the persons making the decision to terminate Plaintiff (Brandt, Hayes, or Rasnic) knew about Simpson's 2013 remarks to Crayton at the time that the remarks were made.

Plaintiff also asks the Court to consider the racially offensive comments made by Kjellin and Simpson as circumstantial evidence of discrimination to establish her prima facie case. As noted by Defendants, these comments were not made in the context of Plaintiff's termination, and the remarks were not made by the decision-makers (Brandt, Hayes, and Rasnic). Moreover, Defendants promptly investigated reports of the remarks and, as pointed out above, Kjellin and

---

[86] (Pl's Surreply p. 3, 81-2.)

[87] *See Mallory.*, 45 F. App'x at 472 ("As a corrections officer, Hawkes had a different supervisor and was governed in some part by different standards of conduct, and therefore he is not a similarly situated person.").

[88] The evidence in the record shows that Crayton reported the conversation to Kjellin. (Brandt Dep. pp. 54-55, ECF No. 57-3.) (Q. "And she [Crayton] said that she had complained to Ms. Kjellin?" A. "Yes." Q. "And Ms. Kjellin said she would get back to her and didn't." A. "Yes.")

Simpson were disciplined for those remarks. It is undisputed that the following actions were taken in response to Plaintiffs' complaints: (1) Simpson was counseled and reminded not to make additional comments because such comments were not tolerated by PharMEDium; (2) the "point persons" idea was not implemented; and (3) diversity training occurred.[89]

Plaintiff claims that Hall is a comparator because he received leadership training while she did not. However, the relevant issue is whether Plaintiff and Hall were treated differently in the disciplinary context – not whether they received the same work opportunities.[90] Thus, the Court finds that, as with Kjellin and Simpson, Hall was not similarly situated to Plaintiff in the context of her termination.

Because Plaintiff cannot establish the fourth prong of a prima facie case of race discrimination regarding her termination, Defendants are entitled to summary judgment on this claim.

Retaliation Claim

A plaintiff may make a prima facie case of retaliation by showing that (1) she engaged in protected activity, (2) the activity was known to the defendant, (3) the plaintiff was subjected to a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action.[91] In their motion, Defendants state that they do not dispute that Plaintiff has established a prima facie case of retaliation for the purpose of deciding the summary

---

[89] (Pl's Resp. to Defs' SOF, ¶ 56, ECF No. 66-1.)

[90] Hall and Simpson's alleged access to leadership and training opportunities not available to Plaintiff could be relevant if Plaintiff was pursuing claims other than her termination claim.

[91] *See Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010).

judgment motion.[92]  Therefore, the Court must decide if Defendants have stated a legitimate non-retaliatory reason for Plaintiff's termination that is not pretextual.

Defendants' burden at this stage is "merely a burden of production, not of persuasion, and it does not involve a credibility assessment."[93]  "Indeed, the employer's burden is light: it is 'satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons.'"[94]  Defendants' stated reasons for Plaintiff's termination are: (1) intimidation of a co-worker, Ada Fifer; (2) misrepresentation/omission of data during an investigation; and (3) possession of company documents without authorization.[95]  These reasons are sufficient to satisfy Defendants' burden of production.  Therefore, the burden shifts back to Plaintiff to show pretext - i.e. that Defendants' "reasons" were fabricated to conceal a retaliatory motive.[96]

Plaintiff "can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."[97]  To ultimately prevail, the

---

[92]  (Defs' Memo. p. 16, ECF 57-1.)

[93]  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009); *see also McNeail–Tunstall v. Marsh USA*, 307 F.Supp. 2d 955, 967 (W.D. Tenn. 2004) (same).

[94]  *Brown v. Ohio State Univ.*, 616 F. Supp.2d 740, 750 (S.D. Ohio 2009) (quoting *Bd. of Trs. v. Sweeney*, 439 U.S. 24, 25 n. 2 (1978)), *aff'd*, 385 F. App'x 486 (6th Cir. 2010).

[95]  (Defs' Resp. to Pl's SOF, ¶ 106, ECF No. 78.)

[96]  *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007)).

[97]  *Chen*, 580 F.3d at 400.

plaintiff must prove that the real reason for the employer's action was retaliation.[98]  However, the plaintiff employee is not required to carry this ultimate burden at the summary judgment stage.  Instead, she "need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rational."[99]  "[S]ummary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation."[100]

Plaintiff has presented the following evidence of pretext.  As to Defendants' contention that she intimidated her co-worker, Plaintiff has pointed to evidence, which if believed, shows that Fifer did not feel intimidated by Plaintiff and, therefore, this reason had "no basis in fact." There is evidence in the record that Human Resources personnel, Gil Gipson and Rosalind Gilmore, spoke to Fifer outside of the presence of Kjellin and that Fifer said that Reed had not been rude or intimidating and that she never felt bullied or harassed Reed.[101]

Regarding Plaintiff's alleged misrepresentation or omission of data during an investigation, i.e., her failure to tell Defendants that she had copies of the alleged threatening pages from Simpson on her phone, Plaintiff has pointed to evidence that she was never asked if she had copies of the pages but, instead, was asked who had seen the pages.  Plaintiff told Defendants that Farsee had seen the pages.  Viewing the evidence in the light most favorable to

---

[98]  *Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir. 2012) (citing *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 522 (6th Cir. 2002)); *see also Chen*, 580 F.3d at 400 n. 4 (advising courts to avoid formalism in the application of this test and to not "lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination").

[99]  *Id.* at 593 (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).

[100]  *Chen*, 580 F.3d at 400 n. 4 (citation omitted).

[101]  (Defs' Resp. to Pl's SOF, ¶ 108, ECF No. 78.)

Plaintiff, the trier of fact could find that Defendants should have followed up with Farsee and Simpson if they were concerned about "wasting" resources in locating the pages and that this stated reason did not actually motivate them to terminate Plaintiff Reed.

There is also a disputed issue of fact as to whether Plaintiff was in possession of company documents without authorization or if those documents were merely training documents. The jury could find that this reason had no basis in fact.

Supporting the Court's finding that there is a disputed issue of fact as to whether Defendants' reasons are pretextual is the temporal proximity between Plaintiff's complaints and her termination. Temporal proximity, standing alone, is not enough to withstand summary judgment.[102] "While temporal proximity is sufficient to meet the low burden required to establish a prima facie case of retaliation in violation of the FMLA, it is not alone sufficient to establish that an employer's legitimate, non-discriminatory reason for discharge was a pretext."[103] But, suspicious timing may be "a strong indicator of pretext when accompanied by some other, independent evidence."[104]

> In the present case, a timeline of the relevant events is as follows:
>
> October 7, 2014 - Plaintiff filed a complaint in which Plaintiff described a series of issues that she believed constituted racial discrimination and harassment. She specifically complained of actions by Kjellin and Simpson.
>
> October 10, 2014 - Plaintiff Crayton filed a complaint of racial discrimination and harassment.

---

[102] *See Skrjanc v. Great Lakes Power Service Company*, 272 F.3d 309 (6th Cir. 2001); *Holley v. Giles County*, 165 F. App'x 447, 451-452 (6th Cir. 2006) ("even a strong temporal connection, without more, is insufficient to withstand summary judgment").

[103] *Heady v. United States Enrichment Corporation*, 146 F. App'x 766, 770-771 (6th Cir. 2005).

[104] *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009) (citation and internal quotation marks omitted).

October 14, 2014 - Brandt informed Kjellin of the complaints filed against her.

October 17, 2014 - Kjellin emailed Toth a "List of Issues" that she had with Plaintiff Reed.

October 23, 2014 - Plaintiffs met with Toth regarding their complaints.

October 28, 2014 - Plaintiff Crayton emailed Brandt to complain of alleged retaliatory behavior by Kjellin.

October 29, 2014 - Plaintiff Reed called Brandt to complain of retaliation.

November 4, 2014 - Brandt conducted a follow-up conversation with Kjellin in which Kjellin acknowledged that a discussion related to race occurred in her presence. Kjellin and Brandt discussed communications training for Simpson. Kjellin also received training.

November 5, 2014 - Farsee discovered a personal notebook belonging to Simpson which allegedly contained threats to harm Plaintiff Reed.

November 7, 2014 - Kjellin picked up all of the notebooks in the laboratory in an attempt to find Simpson's notebook.

November 10, 2014 - Reed filed a charge of racial discrimination and retaliation against PharMEDium with the EEOC.

November 12, 2014 - Reed allegedly needed a laboratory notebook to do her work, but Kjellin told her that she could not have it.

November 13, 2014 - Reed sent an email to Brandt complaining of alleged retaliation by Kjellin.

November 17, 2014 - Kjellin emailed Reed stating that she needed certain work that day. Reed was allegedly unable to complete this work because Kjellin had withheld the notebooks needed to perform the work.

November 18, 2014 - Reed complained to Brandt about the November 17 email from Kjellin.

December 1, 2014 - Kjellin complained to Toth about Plaintiff's review of a chromatography procedure.

December 4, 2014 - Kjellin sent an email to Toth questioning why Reed was in the laboratory after 7 p.m.

December 12, 2014 - Brandt spoke with Reed regarding the outcome of the investigation of Plaintiffs' complaints and the actions that would be taken in response to their complaints.

December 24, 2014 - Reed emailed Brandt again regarding Kjellin's alleged harassment.

December 31, 2014 - Kjellin spoke to Gus Gipson about Fifer's conversation with Plaintiff. Kjellin described Fifer as feeling very upset and harassed. According to Gipson, Fifer never said that she felt bullied or harassed.

Early January 2015 - Brandt learned that Reed had copies on her phone of Simpson's alleged threatening notebook pages.

January 12, 2015 - The decision to terminate Reed was made by individuals who knew that Reed had made complaints of discrimination and retaliation.

January 13, 2015 - Plaintiff was told of the decision.

The trier of fact could find that Defendants' stated reasons were pretextual based on the close proximity in time between Plaintiff Reed's initial complaint about discrimination and her subsequent complaints about retaliation and her termination, combined with the other evidence discussed above.[105] The trier of fact could also find as evidence of pretext that Plaintiff received positive performance evaluations prior to her complaints of discrimination and, after she complained, Kjellin began finding fault with Plaintiff's work, which subjected Plaintiff to increased scrutiny from management.

Because Plaintiff has pointed to evidence in the record from which the finder of fact could find that Defendants' articulated reasons for Plaintiff's termination were pretextual, summary judgment is not appropriate on her retaliation claim. Consequently, Defendants' motion for summary judgment on this claim is denied.

---

[105] *C.f., Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 556 (6th Cir. 2004) (concluding that temporal proximity alone of three months "is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie [retaliation] case.")

<u>Summary and Conclusion</u>

Defendants' motion for summary judgment as to Plaintiff Sheila Reed is **PARTIALLY GRANTED** and **PARTIALLY DENIED**. The motion is **GRANTED** to the extent that Plaintiff has brought any claims other than her § 1981 race discrimination and retaliation claims as they relate to her termination, including a hostile environment claim or any claims under Title VII. The motion is also **GRANTED** on Plaintiff's § 1981 claim that she was terminated because of her race. The motion is **DENIED** on Plaintiff's § 1981 claim that she was terminated in retaliation for complaining of race discrimination.

**IT IS SO ORDERED.**


**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: September 13, 2016