**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| RHONDA CRAYTON and<br>SHEILA REED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **No. 15-cv-2270-STA-cgc** |
| | ) | |
| | ) | |
| PHARMEDIUM SERVICES, LLC and<br>KERI KJELLIN, and JOHN TOTH, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AS TO PLAINTIFF RHONDA CRAYTON**

Plaintiffs Rhonda Crayton and Sheila Reed filed this action against their former employer PharMEDium Services, LLC ("PharMEDium"), and PharMEDium employees, Keri Kjellin and John Toth,[1] pursuant to 28 U.S.C. § 1981.[2]  (ECF No. 1.)  Defendants have filed a motion for summary judgment as to Plaintiff Crayton.  (ECF No. 60), Plaintiff has filed a response to the motion (ECF No. 68), Defendants have filed a reply to the response (ECF No. 79), and Plaintiff

---

[1]  Unlike Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, individuals may be sued for violations of § 1981.  *See Jones v. Cont'l Corp.,* 789 F.2d 1225, 1231 (6th Cir. 1986) ("[T]he law is clear that individuals may be held liable for violations of § 1981.").

[2]  The complaint states that Plaintiffs will file an amended complaint to add claims pursuant to Title VII after receiving a notice of right to sue from the Equal Employment Opportunity Commission ("EEOC").  (ECF No. 1, ¶ 6.) No such amendment has been filed. Therefore, the only claims before the Court are Plaintiffs' § 1981 claims.

has filed a sur-reply.[3]  (ECF No. 81-1.)  For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

<u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the non-movant.[5]  In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence."[6]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[7]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[8]  When determining if summary judgment is

---

[3]  A motion for summary judgment as to Plaintiff Reed was partially granted and partially denied on September 13, 2016.  (ECF No. 85.)  The motion was granted on all claims except her retaliation claim.

[4]  Fed. R. Civ. P. 56(c).

[5]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[6]  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

[7]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

[8]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[9]  The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."[10]

Statement of Facts

The following facts are undisputed unless otherwise noted:

PharMEDium Services, LLC, is a limited liability company organized under the laws of the State of Delaware.  It provides compounding services to hospital pharmacies, including the formulation of pain-management medication used in the administration of epidural anesthesia.  One of PharMEDium's facilities is located at 6100 Global Drive in Memphis, Tennessee.  The Memphis facility compounds admixtures that are narcotic.[11]

During the relevant time period, Defendant John Toth, Caucasian, was the Director of Quality Operations at the Memphis facility.  As the Director of Quality Operations, Toth was responsible for the quality groups in each facility, including the laboratory.  Toth reported directly to Tom Rasnic, the Vice President of Quality Regulatory and Research and Development.[12]

---

[9] *Id.* at 251–52.

[10] *Celotex*, 477 U.S. at 322.

[11] (Pl's Resp. to Defs' SOF, ¶¶ 1 – 4, ECF No. 68-1.)  Plaintiff states that the Memphis facility also performs monitoring and testing of drugs already in circulation.

[12] (*Id.* at ¶¶ 5 – 7.)

During the relevant time period, Defendant Keri Kjellin, Caucasian, was the EPA Lab Manager at the Memphis facility. As the EPA Lab Manager, Kjellin was responsible for assigning work in the lab and selecting employees for particular projects in the lab. She also was responsible for ensuring that the lab's methods and procedures were followed and that the instrumentation was operating appropriately. Kjellin reported directly to Toth.[13] Kjellin supervised ten employees, which included five chemists – Plaintiffs Sheila Reed and Rhonda Crayton, African-American; Dustin Hall, Caucasian; Tanika Aurora, East Indian; and Elizabeth Simpson, Caucasian.[14]

The Memphis lab is charged with testing the identity and potency of final drug products. Once the drug products are compounded on site, a sample of the product goes to the lab for testing. The testing equipment in the lab consists of HPLC (high pressure liquid chromatography) and UPLC (ultra performance liquid chromatography). Balances, water purification systems, and different types of glassware to measure solutions are part of the equipment used in the lab. The testing is done to monitor the operation and to ensure that the processes are staying within a state of control. The Memphis lab is a highly regulated environment by both state and federal regulations.[15]

PharMEDium is committed to developing quality processes that facilitate the highest level of safety for patients who are recipients of critical intravenous and epidural preparation.

---

[13] (*Id.* at ¶¶ 8 – 10.)

[14] (*Id.* at ¶ 11.) The five non-chemist employees supervised by Kjellin were African-American technicians.

[15] (*Id.* at ¶¶ 12 – 15.)

Accordingly, because public safety is dependent upon PharMEDium's services, adherence to its Standard Operating Procedures is important.[16]

PharMEDium's Code of Conduct prescribes goals for employees to follow its policies and procedures.[17]

PharMEDium Policy CPS-016 requires chemists to document their tests at the time the testing is performed ("All performance tasks are to be documented at the time the task is performed.")  This requirement is included in the section which states, "All entries are to be made in ink" and "All entries are to be legible and sized appropriately for the space provided."[18] CPS-016 also provides that "Falsification of documentation will not be tolerated. Any confirmed incident of falsification of documentation must result in a thorough investigation of the circumstances and a written statement by the manager assessing the potential impact the situation may have had on product."  The policy identifies the following as falsification of documentation: "It must never be documented on any form or chart that a check, inspection or test was performed when, in fact, it was not. If a particular check cannot be done . . . Manager must be contacted immediately and told why the check cannot be done."  CPS-016 is in place to comply with the regulatory requirements of the FDA, which is the governmental agency charged with

---

[16] (*Id.* at ¶ 16.)  Plaintiff contends that exceptions are made to the policies and procedures.

[17] (*Id.* at ¶ 17.)  Plaintiff contends that these goals "are violated to fit the desired outcomes of the Defendants." (*Id.*)

[18] (*Id.* at ¶¶ 18 - 21.)  Plaintiff contends that it was "common practice" for chemists and technicians to begin work one day and to finish the following day and that chemists were permitted to note "End of Day" in a notebook if they had not finished their work but ran out of time. The chemists were then allegedly allowed to note "Start of Day" the next day and finish the documentation.  Defendants dispute Plaintiff's contention.  (Defs' Resp. to Pl's SOF, ¶ 95, ECF No. 79-1.)

regulating the pharmaceutical industry.[19]   Section 5.14 lists examples of "Falsification of Documentation."[20]

PharMEDium values correct documentation because it is the only evidence PharMEDium has showing that it complied with the FDA's testing requirements. Because PharMEDium is under scrutiny by the FDA and a negative audit could result in fines and/or ultimately a shut-down of PharMEDium's operations, PharMEDium takes a serious view of violations of CPS-016.[21]

PharMEDium's handbook states that it is committed to providing a work environment free from discrimination and harassment.[22]

Additionally, PharMEDium's handbook outlines prohibited conduct.  The Employee Handbook lists as a major offense: "Falsification or misrepresentation of personnel or other records including time reporting, time cards, expense reports, benefit forms and application forms."[23]

In 2003, Plaintiff Crayton graduated from Tennessee State University with a Bachelor of Science degree in chemistry with an emphasis in biochemistry. She then obtained a Master's Degree in chemistry with an emphasis in medicinal chemistry and drug design in 2005.  Crayton

---

[19]  (Pl's Resp. to Defs' SOF, ¶¶ 19 - 21, ECF No. 68-1.)

[20]  (Defs' Resp. to Pl's SOF, ¶¶ 103-04, ECF No. 79-1.)  Defendants have responded only to those additional facts submitted by Plaintiff that they dispute.  (*Id.* at p. 1 n. 1.)  Therefore, the Court's citation to Defendants' response to an additional fact submitted by Plaintiff indicates an implicit admission by Defendants that the fact is not disputed.

[21]  (Pl's Resp. to Defs' SOF, ¶ 21, ECF No. 68-1.) Plaintiff contends that PharMEDium made exceptions to CPS-016.

[22]  (*Id.* at ¶ 23.)

[23]   (*Id.* at ¶ 24)

completed a fellowship at Vanderbilt University in 2007. As part of the fellowship, Crayton worked in a neuropharmacology lab and worked in a hypertensive lab with rats among other rotations.[24]

On March 11, 2013, Defendant PharMEDium hired Crayton as a temporary employee. A temporary assignment allows both PharMEDium and the potential permanent employee to determine if the employment situation is a good fit. If an employee is hired full time after this temporary period, no major performance issues would be present. Kjellin hired Crayton as a full time End Product Assurance QC Chemist on July 15, 2013.[25]

Plaintiff was specifically hired to work on routine testing, monitoring, and continuing transfers of samples from a third-party lab. Plaintiff's employment was at will, and she was subject to a confidentiality agreement covering PharMEDium's proprietary information and trade secrets. According to Crayton's job description, her responsibilities included: "Receiving, storing and logging in samples testing analysis; . . . Setting up and performing sample analysis per cGMP/GLP Guidelines . . . . [and] Follow Standard Operating Procedures."[26]

Crayton was directly supervised by Keri Kjellin throughout her employment with PharMEDium. Likewise, Kjellin directly supervised Plaintiff Reed, who was also an African-American chemist, throughout Reed's employment with PharMEDium. Kjellin is Caucasian, and she reported to John Toth, who is also Caucasian.[27]

---

[24] (Pl's Resp. to Defs' SOF, ¶ 25, ECF No. 68-1.) (Defs' Resp. to Pl's SOF, ¶ 74, ECF No. 79-1.)

[25] (Defs' Resp. to Pl's SOF, ¶ 75, ECF No. 79-1.)

[26] (Pl's Resp. to Defs' SOF, ¶¶ 26 - 29, ECF No. 68-1.)

[27] (Defs' Resp. to Pl's SOF, ¶ 76, ECF No. 79-1.)

Kjellin conducted annual performance reviews of her subordinates. The rating scale was 1-5 with 5 being the highest. In Kjellin's review of Crayton's work in her annual 2013-2014 performance review, Kjellin rated Crayton as meets expectations or a 3 in all categories. Kjellin testified that no negative comments were made in her annual review of Crayton and that she had no concerns about Crayton's performance.[28]

On September 25, 2014, Kjellin held a lab meeting and announced that she was appointing Dustin Hall, Caucasian, and Elizabeth Simpson, Caucasian, as the "point persons" for the laboratory.[29]

On October 7, 2014, Plaintiff Reed filed a complaint of racial discrimination with Erika Robey, an African-American who was the local HR representative. Plaintiff Reed complained of a series of issues that she believed constituted racial discrimination and harassment. Specifically, she complained that Kjellin had given preference to Hall and Simpson in opportunities and special projects that set them up for advancement over Plaintiffs Reed and Crayton and Ada Fifer, all minority employees. Additionally, she listed a series of individual racially offensive and discriminatory statements allegedly made by Simpson and Kjellin that had occurred during her employment with PharMEDium. Plaintiff stated that she did not feel that she could go to Toth with these issues because Kjellin had repeatedly stated that Toth would back her up regardless of the situation.[30]

---

[28] (*Id.* at ¶¶ 77 –78.)

[29] (*Id.* at ¶ 79.) The parties dispute whether these positions provided supervisory and leadership experience or, instead, were merely "glorified message-takers individuals who relayed to Kjellin messages from employees outside the lab whenever Kjellin was not present in the lab." (*Id*); (Pl's Resp. to Defs' SOF, ¶ 31, ECF No. 68-1.)

[30] (Defs' Resp. to Pl's SOF, ¶ 80, ECF No. 79-1.) Defendants admit that these accusations were made by Plaintiff Reed but not that the accusations were true.

On October 10, 2014, Crayton filed a complaint of racial discrimination and harassment that also included a claim that Kjellin was manipulating the results of the integration of the chromatography in order to bring drugs being tested within specifications. This complaint was filed with Robey and forwarded to Nancy Brandt, Caucasian, who was in HR in the corporate office in Illinois.[31] PharMEDium began an investigation, and Brandt assumed control over the investigation of the complaint.[32]

On October 14, 2014, Brandt conducted a telephone interview with Kjellin in which she informed her that complaints of discrimination had been filed against her. This conversation was when Kjellin learned of the complaints, and it was clear to her the identity of the complainants. In the interview with Brandt, Kjellin stated that Plaintiffs felt that they were "entitled." Kjellin denied that any comments that were race-related took place in the laboratory. Kjellin also stated in response to questions about comments being made about race and minorities, "[D]id anybody stop to think that maybe I'm the minority." Brandt could not recall warning Kjellin not to retaliate against Plaintiffs.[33]

On October 17, 2014, Kjellin sent an email to Toth entitled "List of Issues." In this email, Kjellin listed a series of issues that she claimed were occurring with Robey and Plaintiff Reed. Kjellin stated that a staff member did not feel comfortable around Reed because of her relationship with Robey and that a trust issue had been created. According to Kjellin, a staff member had noted "that after a few days of Sheila being on vacation that there was a peace and calm in the lab from the no interruptions from HR and tension between staff members was

---

[31] (*Id.* at ¶¶ 80, 84.)

[32] (Pl's Resp. to Defs' SOF, ¶ 33, ECF No. 68-1.)

[33] (Defs' Resp. to Pl's SOF, ¶ 82, ECF No. 79-1.)

minimal." Kjellin also wrote in the email that Mason had told her that Robey had pushed Mason to interview Plaintiff Reed for a Quality Supervisor position. According to Kjellin, after the interview, Plaintiff Reed "was visibly annoyed with me because I could not give her any information on the position or why she was not a chosen candidate," was short with Kjellin, and conveyed in her "general disposition" a problem with her attitude. Despite the statements in this email, Kjellin rated Plaintiff Reed as "Exceeds" expectations for teamwork/communication in her 2013-2014 Annual Performance Review. If there had been an issue with Plaintiff's attitude in the time frame Kjellin says it occurred, this would have been the review and rating category where that critique would have been noted. Kjellin did not include any such critique. [34]

On October 21, 2014, Brandt interviewed Plaintiffs in person regarding their claims of racial discrimination and harassment. In their interviews, Plaintiffs detailed their complaints of racial discrimination, including their allegations of unfair assignment of projects and leadership development opportunities, racially offensive and inappropriate statements made in the laboratory by Simpson and Kjellin, and the discriminatory application of company policies between white and minority employees. Brandt believed that Plaintiffs were sincere in their complaints of racial discrimination and harassment.[35]

On October 22, 2014, Brandt met with Toth and Robey. During her meeting with Toth, Brandt instructed him to meet with Simpson and with Plaintiffs.[36]

On October 23, 2014, Plaintiffs met with Toth regarding their complaints. During this meeting, Toth informed Plaintiffs that he was aware of their complaints, which were still under

---

[34] (*Id.* at ¶ 83.)

[35] (*Id.* at ¶ 84.)

[36] (*Id.* at ¶ 85.)

investigation. He informed them that PharMEDium would be rotating the point person position. Toth also met with Simpson at Brandt's direction regarding the comments that Simpson had allegedly made. Following Toth's conversation with Simpson, Brandt instructed Toth to follow up with both Kjellin and Simpson to reinforce PharMEDium's position that there was no tolerance for racially offensive comments.[37]

On October 27, 2014, Rasnic emailed Toth and stated, "I feel as if we are chasing a ghost!" Toth responded in part, "Yes, it seems so. I do not think we should have the expectation that this will be wrapped up with a pretty little bow or that we are going to find somebody to hang this all on." Toth then conducted his interview of Simpson. In his email to Brandt after the interview, Toth pondered having to follow up in writing considering that "Keri has been exonerated on the allegations." Brandt responded that Kjellin said that "she would not say she never participated in a conversation but that she could not remember anything specific."[38]

On October 28, 2014, Plaintiff Crayton emailed Brandt to complain of what she contended was retaliatory behavior at the hands of Kjellin. Specifically, Crayton claimed that since she and Reed had filed their complaints, Kjellin had addressed them in a "sharp and intimidating tone." Crayton also complained that Kjellin was now setting arbitrary deadlines that had never been previously required. Kjellin was also allegedly withholding guidance and

---

[37] (Pl's Resp. to Defs' SOF, ¶ 35, ECF No. 68-1.)

[38] (Defs' Resp. to Pl's SOF, ¶ 87, ECF No. 79-1.)

answers to questions regarding the amendment of standard operating procedures. [39] On October 29, 2014, Plaintiff Reed called Brandt to complain of retaliation.[40]

On November 3, 2014, Brandt conducted telephone interviews with Simpson and Tanika Aurora. In the conversation with Aurora, Aurora confirmed that Simpson had made a comment about individuals having trouble with another employee because English was his second language and that Simpson had asked Plaintiff Reed if Martha Haynes, the first African-American woman to receive a Ph.D. in mathematics, looked black. Simpson received training for making these comments.[41]

On November 4, 2014, Brandt conducted a follow-up conversation with Kjellin in which Kjellin acknowledged that a discussion related to race occurred in her presence. Kjellin did not deny that other statements had been made but just stated that she could not recall if that had happened. Kjellin and Brandt discussed communications training for Simpson. Kjellin also received training. Brandt reiterated that conversations like the ones contained in Plaintiffs' grievances should not occur in the lab.[42]

On November 17, 2014, Kjellin sent an email to Debra Adrowski, an employee from corporate who was brought in to study Crayton's complaints about illegal integration of chromatography results, stating, "Rhonda was requested to update the chromatography procedure. There has yet to be any updates presented." Below this portion of the email, Kjellin

---

[39] (Pl's Resp. to Defs' SOF, ¶ 36, ECF No. 68-1); (Defs' Resp. to Pl's SOF, ¶ 88, ECF No. 79-1.)

[40] (Defs' Resp. to Pl's SOF, ¶ 89, ECF No. 79-1.)

[41] (*Id.* at ¶ 90.)

[42] (*Id.* at ¶ 91); (Pl's Resp. to Defs' SOF, ¶ 38, ECF No. 68-1.)

forwarded a November 3, 2014, email from Kjellin to Crayton. In the forwarded email, Kjellin wrote, "We need to complete the updates to CPS-1057. This was scheduled to be reviewed by October 31st. As of today, I have not received your redlines for review of the updates of this procedure." Kjellin did not inform Adrowski that Toth had tabled this assignment on October 28, 2014, nor did she forward the November 4, 2014, email from Crayton, which stated that the assignment had been tabled until further direction was given.[43]

On December 1, 2014, Kjellin emailed Toth about Reed and Crayton's review of a chromatography procedure.[44] Around this same time, Kjellin began emailing Robey in HR about Crayton's work. Kjellin could not remember ever sending similar emails to HR about an employee's work.[45]

On December 3, 2014, Crayton began testing three samples of esmolol: Memphis, Cleveland, and EPA samples. Crayton ran the set of standards against which all three samples were tested. Crayton recorded the data from this set of standards in one of the notebooks on December 3, 2014, as well as in the reagent notebook. Crayton then ran all three samples against this set of standards. Crayton recorded all of the information for one of the sample tests on December 3, 2014. She then reached the end of the day and noted that she had reached the end of the day in her notebook.[46]

---

[43] (Defs' Resp. to Pl's SOF, ¶ 92, ECF No. 79-1.) Crayton contends that the purpose of Kjellin's email was to place her in a "negative light," while Defendants contend that the email's purpose was to update Adrowski "on the current status of the chromatography." (*Id.*)

[44] (*Id.* at ¶ 93.) The parties dispute Kjellin's motivation in sending the email.

[45] (*Id.* at ¶ 94.) The parties dispute whether Kjellin was "critiquing" Crayton's work or keeping HR informed of her interactions with Crayton due to the complaints made by Crayton against Kjellin.

[46] (*Id.* at ¶ 95.)

On December 4, 2014, Crayton finished the write-up process. In the documentation on December 4, Crayton was able to document the sample preparations and standards because all of the tests have the same standards and the report from the UPLC provides a report for the other information that goes into an Excel spreadsheet. In each of the notebooks, Crayton recorded the date on which the information was recorded in the notebook as well as the date on which the test was run. Crayton never made any attempt to hide anything. Crayton made notations for each task when it was performed. All of the documentation is traceable.[47]

Dustin Hall, a Caucasian chemist, served as the second person reviewer for Crayton's test. CPS-1068, which is the procedure governing second person verification, requires that "All areas that support documentation must be reviewed for accuracy and completeness prior to the final second person review signature." To sign off on an experiment, the second person reviewer must have "a complete understanding of the documentation as it is written. This documentation should be complete, accurate, and make sense for the analysis." Hall made suggested edits in the notebooks, which Crayton then adopted. Hall signed off on the notebooks on December 5, 2014, when Kjellin was in the office. Also on December 5, 2014, Kjellin signed off on Crayton's tests on the Final Approval form. Kjellin only signed off on the monitoring forms. She was not required to examine the notebooks, nor did she do so.[48]

On December 10, 2014, while PharMEDium was wrapping up its investigation, Crayton submitted additional complaints of "further harassing and intimidating behavior." Specifically, Crayton complained that Simpson showed Crayton a brochure and pointed out a name in the hire

---

[47] (*Id.* at ¶ 96.) Defendants do not dispute that these actions occurred but maintain that Crayton was not following PharMEDium's policies and procedures when she did not document her work on the day that it occurred.

[48] (*Id.* at ¶¶ 97 - 98.)

listing (Parthasarathy Vedanthadesikachar) and asked Crayton if she knew how to pronounce the name. Crayton also complained that she had stayed late to work and that she thought Dustin Hall had lingered attempting to look over her shoulder to see what she was working on. Crayton complained that Hall and Simpson were spying on her and Reed. Crayton complained that, since filing her complaint, Kjellin "will come to the lab, stand in the doorway, say nothing, stare at us in an intimidating manner and then walk out. . . . It is very uncomfortable feeling, the anxiety of knowing that someone is after you, and the fear of losing your job at any minute due to continual harassment. We come to work every day to do the best job we can and are put in these situations constantly."[49]

Also on December 10, 2014, Hall brought Crayton's esmolol write-up to Kjellin's attention. Hall presented a potential issue regarding Crayton's documentation of testing that she had conducted in the lab on December 3, 2014, as to which Hall was a second-person reviewer. The documentation concerned the three sets of esmolol samples Crayton analyzed on December 3 and appeared to show that Crayton had failed to document her results on the same day on which she had completed the testing. Kjellin took the documentation to Toth. Toth asked Kjellin to look into the issue and to provide him with an outline or summary of her initial findings regarding how the test was performed.[50]

On December 11, 2014, Kjellin emailed Hall with the subject line, "Follow-Up." In the email, Kjellin wrote, "As a follow up to our conversation around data review, in the future if any part of the documentation does not follow our written documentation procedures we do not want to sign off as a second person reviewer until management has had a chance to review the

_____

[49] (Pl's Resp. to Defs' SOF, ¶ 40, ECF No. 68-1)

[50] (*Id.* at ¶¶ 42, 44, 54); (Defs' Resp. to Pl's SOF, ¶¶ 99, 102, ECF No. 79-1.)

documentation. This does not include basic documentation errors or clarification to documentation." This email was sent one day after the issue was purportedly discovered and before anyone had spoken to Crayton and was considered by Defendants to be a "disciplinary email."[51]

On December 12, 2014, Brandt attempted to speak with Crayton regarding the outcome of PharMEDium's investigation into her complaints. However, because Crayton wanted her legal counsel on the call, Brandt terminated the conversation. On December 15, 2014, Crayton filed a charge of discrimination and retaliation with the EEOC. Brandt spoke with Crayton on December 18, 2014, regarding the investigation. During this meeting, Brandt relayed that PharMEDium was attempting to wrap up its investigation. Brandt further discussed resolution of the point person issue and plans of rolling out a career path for the lab. In response, Crayton informed Brandt that the allegedly retaliatory behavior and racial comments were still occurring.[52]

Kjellin submitted her "Evaluation of Data Integrity" concerning Crayton's documentation on December 19, 2014. Kjellin claimed, "Since documentation was not recorded when the work was actually preformed it can be viewed in the light as falsification of documentation." Kjellin contended that there was precedent for terminating Crayton. Toth responded that the prior incident was different, writing, "So in essence this is not the same as current situation. Ahmad did not document anything where we have documentation in this situation it was just done after

---

[51] (Pl's Resp. to Defs' SOF, ¶ 70, ECF No. 68-1); (Defs' Resp. to Pl's SOF, ¶ 100, ECF No. 79-1.) Although there was no express written policy that individuals who self-reported would be treated more favorably, Defendants contend that its Code of Conduct, which requires employees to report suspected violations, implies leniency for self-reported violations. (*Id.*)

[52] (Pl's Resp. to Defs' SOF, ¶ 41, ECF No. 68-1); (Defs' Resp. to Pl's SOF, ¶ 101, ECF No. 79-1.)

the analysis."[53]  The results of Crayton's testing were never called into question.  All of the esmolol samples tested by Crayton were within specification.[54]

Part of the investigative process required Toth to meet with Crayton.[55]

On December 23, 2014, Crayton was called into a meeting with Gus Gipson, Human Resources, and Toth.  Toth asked Crayton to explain her December 3, 2014, experiment and documentation.  Crayton said she would have to review the documentation since the experiment took place three weeks prior to the meeting. Crayton had never been in a meeting that was conducted with Human Resources present.  Crayton responded that she believed that she was being questioned in this manner because of her grievance in which she complained of racial discrimination and that she would have to go back and review the documentation. The meeting was then ended.[56]

After the meeting, Crayton went to review the notebooks in question. She pulled the notebooks and took them to the document center, a secure location, and made copies.  According to Crayton, she made copies of the pages in question because others chemists were using the notebooks and she did not want to interrupt their workflow by holding on to the actual notebooks during her review. Crayton reviewed the documents and sent an email to Toth explaining her

---

[53]  (Defs' Resp. to Pl's SOF, ¶¶ 102 105, ECF No. 79-1.)

[54]  (Pl's Resp. to Defs' SOF, ¶ 44, ECF No. 68-1.)

[55]  (*Id.* at ¶ 56.)

[56]   (*Id.* at ¶¶ 57-58.)

position on the documentation. Crayton took the copies to the laboratory with her, which is another secure location, and the copies did not leave that location.[57]

Employees in the lab informed Toth that Crayton had been making copies of notebooks in the lab, which allegedly violated lab procedure.[58] Upon learning of this, Toth spoke with Tanya Hayes, Caucasian, Vice President of Human Resources and Chief Human Resources Officer, and Rasnic, about Crayton's actions in the lab. During this phone call, the group decided to place Crayton on suspension.[59]

On December 23, 2014, Crayton was called into a meeting with Rosalind Gilmore, a Human Resources Representative, Gipson, and Toth. She was told that she was being suspended pending the outcome of the investigation concerning allegations that Crayton was making unauthorized copies of notebooks.[60]

While on suspension, Crayton emailed Brandt and Hayes on December 26, 2014. Crayton stated her belief that her suspension was a result of her complaints of race discrimination, and she submitted an overview of her past complaints as well as new complaints of alleged racially discriminatory comments made since her initial complaints and new issues of retaliation by Kjellin. Issues that Crayton contended were new were written in bolded font.[61]

---

[57] (Defs' Resp. to Pl's SOF, ¶¶ 106-107, ECF No. 79-1.) Defendants do not appear to rely on Plaintiff's making copies as an independent ground for her termination.

[58] (Pl's Resp. to Defs' SOF, ¶¶ 59-60, ECF No. 68-1.)

[59] (*Id.*)

[60] (Pl's Resp. to Defs' SOF, ¶ 61, ECF No. 68-1); (Defs' Resp. to Pl's SOF, ¶ 108, ECF No. 79-1.)

[61] (Pl's Resp. to Defs' SOF, ¶¶ 64-65, ECF No. 68-1); (Defs' Resp. to Pl's SOF, ¶ 109, ECF No. 79-1.)

On December 29, 2014, Crayton reported issues with documentation by other employees to Brandt. Crayton sent this email to show Brandt that Crayton believed there were other instances of documentation issues that were similar to the issues for which Crayton was suspended. The example Crayton provided was Aurora signing off on a peer review table. Peer review does not involve the same responsibilities as someone who is conducting a second-person review. However, Crayton used this example to show that Aurora had been asked to sign off on a test that she had not witnessed after the test had occurred. Section 5.14.1(a) states that "[i]t must never be documented on any form or chart that a check, inspection or test was performed when, in fact, it was not." Section 5.14.1(a) does not differentiate between a check, inspection, or test. Kjellin admitted that Aurora had been asked to sign off on a check when she had not been present. Kjellin claims that Aurora's situation was different because it dealt with an "internal lab practice" and not an SOP.[62]

Crayton also stated that Kjellin had failed to sign off on instrument performance tests before employees used the instruments as required by CPS-1205.[63]

After its investigation into Crayton's additional complaints from early December 2014, PharMEDium determined that Crayton's complaints were the same complaints that she had lodged previously – the complaints that PharMEDium had investigated and determined to be meritless. Brandt viewed the complaints as centering on the way in which Kjellin was running the lab. Brandt also investigated the concerns Crayton had emailed her about regarding

---

[62] (Pl's Resp. to Defs' SOF, ¶¶ 64-65, ECF No. 68-1); (Defs' Resp. to Pl's SOF, ¶ 110, ECF No. 79-1.)

[63] (Defs' Resp. to Pl's SOF, ¶ 111, ECF No. 79-1.) According to Defendants, Kjellin "never received these scans on a timely basis, so she was forced to review and sign them as she received them." (*Id.*)

documentation issues and reached the same conclusion as she did when investigating Crayton's other concerns regarding Kjellin.[64]

The lab was audited by an independent third party in December 2014 to ensure there was nothing serious occurring in the lab. The audit did not find any violations based on Plaintiffs' complaints, but neither did it find a violation based on Plaintiff Crayton's documentation. The audit did not investigate Crayton's claims of documentation issues against Hall and Kjellin because the audit was conducted on December 17-18, 2014, prior to Crayton bringing these issues to Defendants' attention on December 29, 2014.[65]

Brandt, Hayes, Toth, Rasnic, and Defendants' general counsel, Rod Bergin, made the decision to terminate Crayton's employment purportedly based on her alleged violation of CPS-016, falsification of documents. According to Defendants, "Crayton's failure to document her results on the same day, as well as taping the wrong paperwork into the notebook, gave the appearance of falsification from an audit standpoint."[66]

PharMEDium sent Crayton a letter, communicating the decision to terminate her employment on January 2, 2015.[67]

---

[64] (*Id.* at ¶¶ 63, 66-67.) Plaintiff agrees that these were Brandt's conclusions but not that the conclusions were accurate. Plaintiff contends that Brandt merely accepted Kjellin's word over her own.

[65] (*Id.* at ¶ 66.)

[66] (*Id.* at ¶¶ 52, 68.) Plaintiff contends that she merely made a mistake in taping the wrong paperwork in the notebook ("overlay error.") According to Plaintiff, she was working on three separate notebook write-ups and did the same write up in a notebook twice. She then realized her error, crossed through it per policy, initialed it, and dated it. She also made a note that it was a duplicate page and referred back to the original data overlay. (*Id.* at ¶ 50.); ( Defs' Resp. to Pl's SOF, ¶ 112, ECF No. 79-1.) Defendants do not appear to rely on Plaintiff's overlay error as an independent ground for her termination.

[67] (Pl's Resp. to Defs' SOF, ¶ 71, ECF No. 68-1.)

Three African-American associate chemists were hired after Plaintiffs were terminated. Plaintiffs' chemist positions were not filled. The associate chemists had never made any complaints against Defendants for racial discrimination.[68]

Other than the complaints from Plaintiffs, PharMEDium has not received any complaints regarding Kjellin or Toth.[69]

<u>Analysis</u>

"Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors."[70] Section 1981 also prohibits an employer's retaliating against an employee for opposing racial discrimination.[71] To prevail, Plaintiff must prove by direct or circumstantial evidence that Defendants intentionally discriminated against her on the basis of race or in retaliation for her complaints of discrimination when they terminated her.[72]

Section 1981 claims are governed by the same burden-shifting standards as Title VII claims.[73] Absent direct evidence of intentional discrimination or retaliation, as in this case, a

---

[68] (*Id.* at ¶ 72.)

[69] (*Id.* at ¶ 73.)

[70] *Spokojny v. Hampton*, 589 F. App'x 774, 777 (6th Cir. 2014) (citing *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 867–68 (6th Cir. 2001)).

[71] *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008).

[72] *Spokojny,* 589 F. App'x at 777 (citing *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006)). In her response, Plaintiff has clarified that her claims are for racial discrimination and retaliation as they relate to her termination and states that she has abandoned any other claims, including her hostile environment claim. (Pl's Resp. p. 1, ECF No. 68.)

[73] *Wade v. Knoxville Utilities Bd.,* 259 F.3d 452, 464 (6th Cir. 2001). *See also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race

plaintiff must use the *McDonnell Douglas* framework for proving discrimination or retaliation through circumstantial evidence.[74]   Under this framework, if Plaintiff establishes a prima facie case of race discrimination or retaliation, Defendants must then articulate a legitimate, nondiscriminatory reason for their employment decision.[75]   If Defendants articulate a legitimate, nondiscriminatory reason for the decision to terminate Plaintiff, any presumption of discrimination or retaliation drops from the case, and Plaintiff must prove by a preponderance of the evidence that Defendants' stated reason was pretextual.[76]   Although the burden of production shifts, the ultimate burden of persuading the trier of fact that Defendants intentionally discriminated or retaliated against Plaintiff remains at all times with Plaintiff.[77]

Race Discrimination Prima Facie Case

To demonstrate a prima facie case of race discrimination, the plaintiff must show that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected

---

discrimination brought under § 1981 . . . under the same standards as claims of race discrimination brought under Title VII.")

[74] *McDonnel-Douglas Corp. v. Greene*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1994).  *See Lindsay v. Yates*, 498 F.3d 434, 440 n. 7 (6th Cir. 2007) ("The *McDonnell Douglas/Burdine* framework applies only when discrimination plaintiffs rely on circumstantial evidence to prove their claims.").

[75] *Hicks*, 509 U.S. at 506-07.

[76] *Id.* at 507.

[77]  *Burdine*, 450 U.S. at 256.

employees."[78]  "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination."[79]

Here, it is undisputed that Plaintiff Crayton meets the first three elements of the prima facie case.  She is African–American; she was terminated; and she was qualified for the position that she held.  Defendants contend that Plaintiff cannot show that she was treated differently than similarly-situated, non-protected employees.   The Court finds Defendants' argument to be unpersuasive.

Although the Sixth Circuit Court of Appeals held in *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992), that to be considered "similarly situated" in the disciplinary  context, "the plaintiff must show that the 'comparables' are similarly-situated *in all respects,*" the Court later clarified that "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar[, that is, "nearly identical,"] in "all of the *relevant* aspects."[80]

> Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct

---

[78]  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).

[79]  *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 313 (6th Cir. 2012).  *See also Baldwin v. Wright Patterson Air Force Base*, 463 F. App'x 487, 490 (6th Cir. 2012) (quoting *Macy*).

[80]  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (citation omitted) (explaining that "*Mitchell* itself only relied on those factors relevant to the factual context in which the *Mitchell* case arose).

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.[81]

Courts "should not demand exact correlation, but should instead seek relevant similarity."[82] "In the disciplinary context, [the Sixth Circuit has] held that to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'"[83]

In the present case, Plaintiff points to Dustin Hall as a Caucasian employee who was similarly situated to her and committed the same violation but was treated differently. It is undisputed that Hall and Plaintiff were both chemists working for PharMEDium under the direct supervision of Defendant Kjellin. Plaintiff was accused of "falsifying" company documents by not documenting tasks on the day that the task was performed. Hall served as the second person reviewer for Crayton's test and signed off on the on the notebooks on December 5, 2014, when Kjellin was in the office.

PharMEDium's CPS-1068, which is the procedure governing second person verification, requires that "All areas that support documentation must be reviewed for accuracy and completeness prior to the final second person review signature."[84] To sign off on an experiment,

---

[81] *Mitchell*, 964 F.2d at 583. *See also Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 471- 72 (6th Cir. 2002) (discussing that a similarly situated employee is one who has the same supervisor, was subject to the same standards of conduct, and engaged in "nearly identical" conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's response).

[82] *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

[83] *Wright*, 455 F.3d at 710 (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)).

[84] (Defs' Resp. to Pl's SOF, ¶ 97, ECF No. 79-1.)

the second person reviewer must have "a complete understanding of the documentation as it is written. This documentation should be complete, accurate, and make sense for the analysis."[85]

Despite his violation of CPS-1068, Hall merely received a cautionary email from Kjellin instructing him that "in the future if any part of the documentation does not follow our written documentation procedures we do not want to sign off as a second person reviewer until management has had a chance to review the documentation."

Defendants contend that Hall received a lesser discipline than Crayton because Hall self-reported and PharMEDium has a policy that those who self-report are not disciplined.[86] However, the "self-report policy" is not stated in the Code of Conduct or the Employee Handbook. Additionally, this policy was never communicated to the employees nor was it cited in Kjellin's email to Hall. The trier-of-fact could find no distinction between the purported policy violations by Crayton and Hall who were both responsible for completing the esmolol documentation correctly and who signed off on the documentation in question. Thus, there is a disputed issue of fact as to whether Crayton (African-American) and Hall (Caucasian), who were similarly situated employees, were treated differently in their discipline.

Additionally, the record shows that, Tanika Aurora, an East Indian chemist also supervised by Kjellin, signed off on a peer review table without witnessing the test and was not terminated. Defendants contend that Aurora merely violated a lab practice rather than a regulatory policy. However, CPS-016 provide that "[i]t must never be documented on any form

---

[85] (*Id.*)

[86] The trier-of-fact could find that Kjellin's email to Hall did not rise to the level of a disciplinary action and, thus, Hall received no discipline for his violation of PharMEDium's policy while Crayton was terminated for the same violation.

or chart that a check, inspection or test was performed when, in fact, it was not."[87]  The trier-of-fact could reject Defendants' distinction and find that the policy makes no exception for "lab practices" versus regulatory policies.

Thus, Crayton has established a prima facie case of race discrimination as to her termination.

Retaliation Prima Facie Case

A plaintiff may make a prima facie case of retaliation by showing that (1) she engaged in protected activity, (2) the activity was known to the defendant, (3) the plaintiff was subjected to a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action.[88]  In their motion, Defendants state that they do not dispute that Plaintiff has established a prima facie case of retaliation for the purpose of deciding the summary judgment motion.[89]

Defendants' Legitimate Non-Discriminatory Reason and Pretext

Defendants contend that, even if Plaintiff has established a prima facie case, they have articulated a legitimate non-discriminatory reason for her termination that was not a pretext for discrimination or retaliation.  Defendants' burden at this stage is "merely a burden of production, not of persuasion, and it does not involve a credibility assessment."[90]  "Indeed, the employer's burden is light: it is 'satisfied if he simply explains what he has done or produces evidence of

---

[87] (Defs' Resp. to Pl's SOF, ¶ 110, ECF No. 79-1.)

[88] *See Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010).

[89] (Defs' Memo. p. 17, ECF 60-1.)

[90] *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009); *see also McNeail–Tunstall v. Marsh USA*, 307 F.Supp. 2d 955, 967 (W.D. Tenn. 2004) (same).

legitimate nondiscriminatory reasons.'"[91]  Defendants' stated reason for Plaintiff's termination is that she violated company policy CPS-016, which requires that work be documented at the time testing is performed.  This reason is sufficient to satisfy Defendants' burden of production.  Therefore, the burden shifts back to Plaintiff to show pretext - i.e. that Defendants' "reason" was fabricated to conceal a discriminatory and/or retaliatory motive.[92]

Plaintiff "can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."[93]  To ultimately prevail, the plaintiff must prove that the real reason for the employer's action was discrimination or retaliation.[94]  However, the plaintiff employee is not required to carry this ultimate burden at the summary judgment stage.  Instead, she "need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rational."[95]  "[S]ummary

---

[91]  *Brown v. Ohio State Univ.*, 616 F. Supp.2d 740, 750 (S.D. Ohio 2009) (quoting *Bd. of Trs. v. Sweeney*, 439 U.S. 24, 25 n. 2 (1978)), *aff'd*, 385 F. App'x 486 (6th Cir. 2010).

[92]  *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007)).

[93]  *Chen*, 580 F.3d at 400.

[94]  *Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir. 2012) (citing *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 522 (6th Cir. 2002)); *see also Chen*, 580 F.3d at 400 n. 4 (advising courts to avoid formalism in the application of this test and to not "lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination").

[95]  *Id.* at 593 (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).

judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation."[96]

Viewing the evidence in the light most favorable to Plaintiff, the non-moving party, the Court finds that Plaintiff has presented the following evidence of pretext. On October 7 and October 10, 2014, Plaintiff Reed and Plaintiff Crayton filed complaints of racial discrimination and harassment with Robey in the local HR office. The complaints centered around Kjellin's alleged discriminatory actions toward Plaintiffs. Crayton's complaint also alleged that Kjellin had manipulated the results of a test. Brandt, Caucasian, in the corporate HR office, was placed in charge of the investigation because Rasnic, Toth's supervisor, did not believe that Robey, African-American, could be unbiased.[97]

After filing her initial complaint with HR, Plaintiff Clayton continued to complain of discrimination, harassment, and retaliation by Kjellin, who had been informed of Plaintiffs' complaints against her. It was ultimately determined that Kjellin has been a party to at least one racially insensitive comment, and she received counseling and additional training because of this.

On December 10, 2014, Kjellin took Dustin Hall to Toth's office to report possible documentation issues in laboratory notebooks prepared by Crayton concerning her testing of samples of esmolol on December 3 and finishing the documentation on December 4. Hall, who was the second person reviewer of the documentation, had signed off on the documentation as being accurate and complete on December 5, 2014.

---

[96] *Chen*, 580 F.3d at 400 n. 4 (citation omitted).

[97] (Brandt Dep. pp. 39-40, ECF No. 68-32.) Kjellin had reported that she did not believe that Robey could conduct a fair investigation into Plaintiffs' complaints since Robey was purportedly friendly with Plaintiff Reed. (Kjellin Dep. pp. 68-69, ECF No. 68-4.)

Even though Crayton had made a complaint against Kjellin, Toth instructed Kjellin to look into the documentation issues and provide him with a summary of her findings. Kjellin reported to Toth that Crayton had falsified documentation concerning the esmolol samples even though (1) the standards were correctly documented on at least one run and put in the notebook; (2) the information was the same for all three runs; and (3) the documentation would have been retrievable.[98] Moreover, Crayton had made no effort to hide the timing of any of her testing or the date on when she recorded the results. Crayton noted when the testing date was different from the date items were recorded and had written "End of Day" after recording data in the first notebook when she did not have time to finish the rest of the write-up. Kjellin did not consider this to be a question as to whether the standards had been recorded accurately but, instead, whether the policy had been followed.[99] In fact, a "nonconformance investigation" showed that all the samples at issue were within specification.[100]

Crayton testified in her deposition that it was common practice at PharMEDium to begin testing and record data in a notebook but not have enough time in a day to finish documentation.[101] In such circumstances, chemists were instructed to write "End of Day" in the notebook. The following day they would then write "Start of Day" with the date and continue the documentation and analysis, which is the procedure that Crayton followed in the notebooks in question. Kjellin conceded that, in certain circumstances, the "End of Day/Start of Day" process was used by chemists, although she contended that it was not "appropriate" in this particular

---

[98] (Kjellin Dep. pp. 169-170, ECF No. 68-4.)

[99] (*Id.* at pp. 170-171.)

[100] (*Id.* at p 180.)

[101] (Crayton Dep p. 164, ECF No. 68-5.)

circumstance.[102]  As such, a jury could find that Crayton acted consistently with known past laboratory practice.[103]

Defendants claim that Crayton's termination was necessary because it was concerned about potential fines or other penalties from the FDA which requires that all documentation be traceable. However, there is evidence that all of Crayton's documentation was traceable and all of the results of the samples were in specification. Kjellin testified that all of the esmolol samples were within specifications, that the esmolol was already out in hospitals or treating patients, and that there was no reason to perform a recall.[104] Thus, a jury could find that all the documentation met FDA regulations.[105]

In light of this evidence, the trier-of-fact could find that Defendants' stated reason for Plaintiff's termination had no basis in fact and was merely pretextual.

PharMEDium claims that, even if there is a dispute issue of fact as to whether Crayton actually committed any violation of the documentation policies and practices of PharMEDium, summary judgment should still be granted because PharMEDium had an "honest belief in its proffered nondiscriminatory reason for discharging an employee" and that Plaintiff cannot

---

[102]  (Kjellin Dep. pp. 168-169, ECF No. 68-4.)

[103]  Even if Crayton's documentation was a violation of laboratory policy, a jury could find that it was Kjellin's and Toth's efforts to manipulate the facts and policies to define the violation as "falsification" that resulted in the termination. (*See* Kjellin Dep, Ex. 89 ("Since documentation was not recorded when the work was actually preformed [sic] it can be viewed in the light as falsification of documentation.")).

[104]  (*Id.* at p 180.)

[105]  The parties dispute the significance of an internal audit in December 2014.  Plaintiff points out that the internal audit demonstrated that no violations existed within her documentation, while Defendants note that the audit was a general review of all documentation and not an audit to look into specified allegations.  To the extent that the parties have different interpretations of the audit, they can present evidence and argue those interpretations at trial.

establish pretext simply by showing that PharMEDium was incorrect. PharMEDium is correct

that, if an employer has an "honest belief" in the nondiscriminatory basis upon which it has made

its employment decision, then the employee will not be able to establish pretext.[106] Thus,

"[w]hen an employer reasonably and honestly relies on particularized facts in making an

employment decision, it is entitled to summary judgment on pretext even if its conclusion is later

shown to be 'mistaken, foolish, trivial, or baseless.'"[107] However,

> [t]he employer's claim of honest belief is necessarily tied to the nature of its
> investigation and disciplinary decision process. We have noted that the "key
> inquiry ... is 'whether the employer made a reasonably informed and considered
> decision before taking' the complained-of action." *Michael v. Caterpillar Fin.*
> *Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007) (quoting *Smith v. Chrysler*
> *Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). The employer certainly must point to
> particularized facts upon which it reasonably relied. But "we do not require that
> the decisional process used by the employer be optimal or that it left no stone
> unturned." *Smith*, 155 F.3d at 807; *see also Allen v. Highlands Hosp. Corp.*, 545
> F.3d 387, 398 (6th Cir. 2008).
>
> To defeat a summary judgment motion in such circumstances, the "plaintiff must
> produce sufficient evidence from which the jury could reasonably reject [the
> defendants'] explanation and infer that the defendants ... did not honestly believe
> in the proffered nondiscriminatory reason for its adverse employment action."
> *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (internal
> citations, quotation marks, and brackets omitted) (alteration in original).[108]

In response to Defendants' "honest belief" defense, Plaintiff relies on a "cat's paw theory

of liability." Under this theory, "if a supervisor performs an act motivated by [discriminatory]

animus that is *intended* by the supervisor to cause an adverse employment action, and if that act

---

[106] *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)
(stating that "as long as an employer has an honest belief in its proffered nondiscriminatory
reason for discharging an employee, the employee cannot establish that the reason was pretextual
simply because it is ultimately shown to be incorrect").

[107] *Chen*, 580 F.3d at 401 (quoting *Clay*, 501 F.3d at 713–15 ).

[108] *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012).

is a proximate cause of the ultimate employment action, then the employer is liable."[109]   To

prevail under this theory, Plaintiff must show that by relying on a "discriminatory information

flow [Defendants] acted as the conduit of [Kjellin and Toth's] prejudice—[their] cat's paw."[110]

The alleged racial and/or retaliatory animus of Kjellin and Toth can be imputed to Defendants if

Plaintiff can show that (1) Kjellin and Toth "intended to cause an adverse employment action"

and (2) their action was "a proximate cause of the ultimate employment action."[111]   Accordingly,

Defendants cannot rely on an honest-belief defense if an improper motivation by Kjellin and/or

Toth can be imputed to them through a cat's paw theory of liability.[112]

> The Supreme Court has made clear that
>
> [a]nimus and responsibility for the adverse action can both be attributed to the
> earlier agent … if the adverse action is the intended consequence of that agent's
> discriminatory conduct. So long as the agent intends, for discriminatory reasons,
> that the adverse action occur, he has the scienter required to be liable under [the
> Act].[113]

---

[109]   *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); s*ee also Bobo v. United Parcel Service*,
665 F.3d 741, 755 (6th Cir. 2012) (quoting *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582,
586 n. 5 (6th Cir. 2009)) (explaining that the "cat's paw" theory of liability "refers to a situation
in which a biased subordinate, who lacks decision-making power, influences the unbiased
decisionmaker to make an adverse [employment] decision, thereby hiding the subordinate's
discriminatory intent").

[110]   *Madden Chattanooga City Wide Service Dep't.*, 549 F.3d 666, 678 (6th Cir. 2008) (internal
quotation marks omitted).

[111]   *Staub*, 562 U.S. at 422.

[112]   *See Henry v. Shawnee Specialties, Inc*., 2016 WL 1253041 at *5 (W.D. Mich. Mar. 31, 2016)
(citing *Pears v. Mobile Cnty.*, 645 F. Supp. 2d 1062, 1093 n.45 (S.D. Ala. 2009)).

[113]   *Staub*, 562 U.S. at 418-419.

The intent element is easily satisfied,[114] and Plaintiff has shown that a genuine issue of material fact exists regarding whether Kjellin and Toth intended that she be terminated.

Next, Plaintiff must show the existence of a genuine issue of material fact as to whether Kjellin and Toth's influence and actions were a proximate cause of her termination.

> Cat's paw liability attaches when the biased intermediate employee's actions are "a causal factor of the ultimate employment action." *Staub*, 131 S.Ct. at 1193. The intermediate employee's actions need not be the sole cause of the adverse action; "[t]he decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *Id.* at 1192 (citations omitted) (emphasis in original).

> An employer will not be liable for its intermediate employee's discrimination if "the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action." *Id.* at 1193. However, if the adverse employment action is related to the discriminatory action, the employer may be liable. Neither independent investigation nor independent judgment on the part of the employer provides a per se defense. For example, if the intermediate supervisor makes a biased report to the ultimate decisionmaker, it may be a causal factor in the adverse action if the independent investigation by the employer "takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* Also, if "the independent investigation relies on facts provided by the biased supervisor," *id.*, then the investigation was not, in actuality, independent and the employer is liable.[115]

Here, there is evidence that Defendants relied on evidence from Kjellin and Toth in making their decision to terminate Plaintiff. Although Kjellin did not take part in the decision to terminate Crayton, the trier-of-fact could find that the decisionmakers relied on Kjellin's characterization of Crayton's work in making the termination decision even though there was evidence that Kjellin was not non-partial and Defendants had reason to know that Kjellin was not non-partial.

---

[114] *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012).

[115] *Chattman*, 686 F.3d at 352 (footnote omitted).

Additionally, the trier-of-fact could find that Toth took part in the decision to terminate Crayton and was allowed to influence the other decisionmakers even though he had evidenced a retaliatory motive against Crayton when he expressed a desire to "tie a pretty little bow" around the underlying investigation into Crayton's complaints and "hang it all on" someone. The trier-of-fact could also find that Toth's expression of satisfaction when Kjellin convinced him that another employee had been terminated under the same circumstances ("Excellent. That's how I wanted to hear it.") showed that he was looking for a way to terminate Crayton's employment.[116] In light of this evidence, the "honest belief" rule is inapplicable.

Defendants also contend that that they are entitled to the "same actor inference" reasoning that, because Kjellin hired Crayton, she would not have also caused her to be discharged. In *Buhrmaster v. Overnite Transportation Co.*, 61 F.3d 461 (6th Cir. 1995), the Sixth Circuit adopted the same-actor inference "which allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee."[117] However, the Sixth Circuit has "reject[ed] the idea that a mandatory inference must be applied in favor of a summary-judgment movant whenever the claimant has been hired and fired by the same individual."[118] Instead, the Circuit has "specifically" held that even when "the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact."[119]

---

[116] (Defs' Resp. to Pl's SOF, ¶ 105, ECF No. 79-1.) Defendants deny that Kjellin "convinced" Toth that there was precedent for terminating Plaintiff Crayton. Whether or not Kjellin convinced him is a disputed issue of fact for the jury.

[117] *Id.* at 463.

[118] *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003).

[119] (*Id.* at 573-74).

Additionally, other evidence, such as the length of time between hiring and firing, may undermine the inference.[120]  In this case, Plaintiff was hired as a temporary chemist on March 11, 2013, and as a permanent chemist on July 15, 2013.  She was terminated on January 2, 2015. This interval weakens the inference, as does the fact that Plaintiff made numerous complaints against Kjellin during her employment.  In light of Plaintiff's other evidence of pretext, the Court declines to apply the same actor inference.

Supporting the Court's finding that there is a disputed issue of fact as to whether Defendants' reasons are pretextual is the temporal proximity between Plaintiff's complaints and her termination.  Temporal proximity, standing alone, is not enough to withstand summary judgment.[121]  "While temporal proximity is sufficient to meet the low burden required to establish a prima facie case of retaliation in violation of the FMLA, it is not alone sufficient to establish that an employer's legitimate, non-discriminatory reason for discharge was a pretext."[122]  But, suspicious timing may be "a strong indicator of pretext when accompanied by some other, independent evidence."[123]

In the present case, a timeline of the relevant events is as follows:

September 25, 2014 - Kjellin held a lab meeting and announced that she was appointing Hall and Simpson as the "point persons" for the laboratory.

---

[120]  *See Buhrmaster*, 61 F.3d 461 at 464.

[121]  *See Skrjanc v. Great Lakes Power Service Company*, 272 F.3d 309 (6th Cir. 2001); *Holley v. Giles County*, 165 F. App'x 447, 451-452 (6th Cir. 2006) ("even a strong temporal connection, without more, is insufficient to withstand summary judgment").

[122]  *Heady v. United States Enrichment Corporation*, 146 F. App'x 766, 770-771 (6th Cir. 2005).

[123]  *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009) (citation and internal quotation marks omitted).

October 10, 2014 - Plaintiff Crayton filed a complaint of racial discrimination and harassment.

October 14, 2014 - Brandt informed Kjellin of the complaints filed against her.

October 23, 2014 - Plaintiffs met with Toth regarding their complaints.

October 28, 2014 - Plaintiff Crayton emailed Brandt to complain of alleged retaliatory behavior by Kjellin.

November 4, 2014 - Brandt conducted a follow-up conversation with Kjellin in which Kjellin acknowledged that a discussion related to race occurred in her presence. Kjellin and Brandt discussed communications training for Simpson. Kjellin also received training.

November 17, 2014 - Kjellin emailed Debra Adrowski, a corporate employee, about work that Crayton allegedly had not performed even though Toth had tabled this assignment.

December 1, 2014 – Kjellin began emailing Robey about Crayton's work; Kjellin could not remember ever sending similar emails to HR about an employee's work.

December, 10, 2014 – Crayton submitted additional complaints of harassing and intimidating behavior by Kjellin.

December 10, 2014 - Kjellin reported to Toth that there were possible documentation issues with Crayton's work.

December 15, 2014 - Crayton filed a charge of discrimination and retaliation with the EEOC.

December 18, 2014 - Brandt spoke with Crayton regarding the investigation. During this meeting, Crayton informed Brandt that the allegedly retaliatory behavior and racial comments were still occurring.

December 19, 2014 – Kjellin submitted her findings about Crayton's documentation to Toth.

December 23, 2014 - Crayton was called into a meeting with Gus Gipson, Human Resources, and Toth and was asked Crayton to explain her December 3, 2014, experiment and documentation. Crayton responded that she believed that she was being questioned in this manner because she had complained of racial discrimination. Crayton was suspended without pay during this meeting pending the outcome of the investigation.

December 26, 2014 - Crayton emailed Brandt and Hayes and stated her belief that her suspension was a result of her complaints of race discrimination, and she submitted an overview of her past complaints as well as new complaints of alleged racially discriminatory comments made since her initial complaints and new issues of retaliation by Kjellin.

December 29, 2014 - Crayton reported issues with documentation by other employees to Brandt.

January 2, 2015 – The decision was made to terminate Crayton and a termination letter was sent to her.

The trier of fact could find that Defendants' stated reasons were pretextual based on the close proximity in time between Plaintiff initial complaint about discrimination and her subsequent complaints about retaliation and her termination, combined with the other evidence discussed above.[124]   The trier of fact could also find as evidence of pretext that Plaintiff received positive performance evaluations prior to her complaints and, after she complained, Kjellin began finding fault with Plaintiff's work, which subjected Plaintiff to increased scrutiny from management.[125]

Defendants claim that another employee, Ahmad Dawas, was terminated under identical circumstances as Crayton.  However, Dawas was a temporary employee and, thus, is not a proper comparator to Crayton, a permanent employee.[126]

---

[124] *C.f., Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 556 (6th Cir. 2004) (concluding that temporal proximity alone of three months "is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie [retaliation] case").

[125] *See Evans v. Prospect Airport Servs., Inc.*, 286 F. App'x 889, 895 (6th Cir. 2008) (stating that "indicia of retaliatory conduct would include . . . evidence that the plaintiff was subjected to closer disciplinary scrutiny after exercising her rights").

[126] Toth Email Ex. p. 13, ECF No. 68-3.)  There is also evidence that Dawas had performed a test and failed to make any documentation or record any results of the tests, as opposed to Crayton who was accused of not making contemporaneous documentation.  (*Id.*)

Because Plaintiff has pointed to evidence in the record from which the finder of fact could find that Defendants' articulated reason for Plaintiff's termination was pretextual, summary judgment is not appropriate. Consequently, Defendants' motion for summary judgment is denied.

<u>Summary and Conclusion</u>

Defendants' motion for summary judgment as to Plaintiff Rhonda Crayton is **PARTIALLY GRANTED** and **PARTIALLY DENIED**. The motion is **GRANTED** to the extent that Plaintiff has brought any claims other than her § 1981 race discrimination and retaliation claims as they relate to her termination, including a hostile environment claim or any claims under Title VII. The motion is **DENIED** on Plaintiff's § 1981 claim that she was terminated because of her race and/or in retaliation for complaining of race discrimination.

**IT IS SO ORDERED.**

 

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: September 30, 2016.